Amanda Arceneaux FONTENOT, Della Fontenot Cassidy, Yvonne Marie Fontenot, Alton H. Fontenot, Alma Fontenot Seale and Florence Fontenot Rozas,

v.

AUSTRAL OIL EXPLORATION COMPANY, Inc., The Texas Company, and Pan American Petroleum Corporation and Oil Participations, Inc.

Civ. A. No. 6835.

United States District Court
W. D. Louisiana,
Lake Charles Division.

Nov. 26, 1958.

Jacque B. Pucheu, Eunice, La., Charles Cassidy, Jennings, La., for plaintiffs.

Liskow & Lewis, Lake Charles, La., Richard S. Lake and Wm. J. Conrad, W. P. Hardeman, New Orleans, La., for defendants.

HUNTER, District Judge.

Originally filed in state court and removed here, this case is now pending on motions for summary judgment filed by all parties. The facts are not in dispute.

On December 1, 1950, plaintiffs granted to Albert D. Miller a mineral lease covering 3,400 acres of land situated in Jefferson Davis Parish and Cameron Parish, Louisiana. The lease was subsequently acquired by The Texas Company and delay rentals were paid under the lease through the end of·the five-year primary term. Prior to the end of the primary term The Texas Company sub-leased to Austral Oil Exploration Company, Inc., and Pan-American Production Company the leasehold rights on 960 acres.

Under the sublease hereinabove referred to, Austral and Pan-American commenced the drilling of a well on October 26, 1955, which was drilled to a depth of 13,500 feet, plugged back to 9,900 feet and completed there as a producer of gas and gas distillate on January 27, 1956. This well, drilled at a cost of $503,000, is still producing gas and gas distillate in substantial and paying quantities.

In May of 1956 production from said well became marketable and the following events subsequently occurred:

(1) On July 17, 1956, plaintiffs' attorney wrote Pan-American Petroleum Corporation two letters, one requesting and one demanding "that the company take steps to drill an offset well to the Amanda Fontenot No. 1" (this was the well the drilling of which commenced on October 26, 1955).

(2) On July 20, 1956, Pan-American wrote plaintiffs' attorney, explaining that the company, lessees, was studying the subsurface situation and asked "that you bear with us for a couple of weeks after which I believe the management of Pan-American and its partner, Austral Oil Exploration Company, will be in a position to give you some definite answer with respect to further development of the Fontenot tract."

(3) On August 10, 1956, Pan-American informed plaintiffs that the location for a second well had been made, subject to Austral Oil's approval.

(4) On August 20, 1956, Pan-American advised plaintiffs' counsel that the test well would definitely be drilled on the Fontenot lease "as soon as a drilling rig becomes available." The well, Fontenot No. 2, was spudded October 11, 1956, drilled to a depth of 17,416 feet, and abandoned as a dry hole on January 15, 1957.

(5) On March 18, 1957, petitioners wrote Pan-American requesting infor-

**38**

mation as to when they could expect other wells.

(6) On February 26, 1957—forty-one days after the abandonment of this deep well—plaintiffs' attorney wrote Pan-American, calling attention to the abandonment and requesting the company's consideration to releasing a part of the 3,500 acre tract.

(7) On March 21, 1957, Pan-American "replied to plaintiffs' attorney, stating we feel that we have fulfilled our obligation, for the time being, and that further drilling would be exploratory in nature, and we should have a reasonable time to make further geological study and plans in that respect." In this letter, Pan-American explained that the Amanda Fontenot No. 1 could adequately drain the productive area.

(8) On March 30, 1957, plaintiffs' counsel demanded a definite commitment from Pan-American and in default thereof demanded partial cancellation of the lease.

(9) On May 3, 1957, Pan-American wrote plaintiffs' counsel that they were still studying the South Thornwell Steel Structure (which is not actually a part of the involved lease) and expected to complete their study within two weeks. In this letter Pan-American agreed that Fontenot No. 1 would not hold the entire acreage involved in this litigation indefinitely.

(10) On May 22, 1957, Pan-American again wrote plaintiffs' counsel, pointing out that the companies were still conducting exploratory operations in the vicinity of the Fontenot lease, and "request that you bear with us and recognize that we are proceeding with due diligence in an attempt to work out a satisfactory plan that will be to both your clients' advantage, as well as to our own."

(11) On July 25, 1957, Pan-American informed the attorney for plaintiffs that Austral planned to drill an additional well on the Fontenot acreage, but that Pan-American would not join them in the drilling of the well, but would as-

sign to Austral all the leasehold rights owned jointly by them, except for 320 acres around the Fontenot No. 1 producing well.

(12) The Fontenot B-1 well, the third drilled on this lease, was commenced by Austral on September 25, 1957, drilled to a depth of 10,022 feet, and abandoned as a dry hole on October 17, 1957.

(13) On October 31, 1957, plaintiffs' counsel wrote Pan-American asking for a release of the acreage except for the area around the Amanda Fontenot No. 1. Pan-American informed plaintiffs' attorney that it had no further interest in this acreage, and that a formal assignment to Austral was then being prepared, covering all the leasehold rights except the area around the Fontenot No. 1. A copy of this letter was sent to Austral, and on December 6, 1957, Austral wrote plaintiffs' attorney, informing him that Austral considered its operations had maintained the lease in full force and effect to date, and declined to execute the requested release.

(14) On December 15, 1957, plaintiffs' attorney wrote Austral, Pan-American and The Texas Company, demanding that the property be diligently developed, giving lessees "sixty days in which to take steps to develop the property or else suit will be necessary."

(15) On January 29, 1958, Austral wrote plaintiffs' attorney advising him that it was Austral's opinion that the portion of the lease covered by the sublease was in effect as a result of the production from Fontenot well No. 1.

(16) On January 31, 1958, The Texas Company sent the attorney for plaintiffs a copy of a release of the lease as to the 960 acres still owned by The Texas Company.

(17) The suit was filed on March 6, 1958. It seeks cancellation for the lease except as to the leasehold rights above 9,300 feet on a tract of 340 acres around Fontenot No. 1. The 340 acres are not otherwise described.

From the time Austral and Pan-American first commenced operations in

the general area and the date of the demand letter which resulted in the filing of this suit, Pan-American and Austral participated in the drilling of a total of 17 wells, three of which were on the Fontenot lease and 14 of which were in the vicinity thereof. These wells were:

(1) The Lacassane Company No. 1 in Section 1, Township 12 South, Range 5 West, commenced June 20, 1954, drilled to a total depth of 15,043 feet at a cost of $522,000.

(2) Benoit No. 1 in Section 25, Township 11 South, Range 5 West, commenced January 15, 1955, drilled to a total depth of 12,883 feet at a cost of $903,000.

(3) Louisiana State Rice Milling No. 1 well in Section 25, Township 11 South, Range 5 West, commenced June 11, 1955, drilled to a total depth of 13,230 feet at a cost of $616,000.

(4) Benoit No. 2 in Section 25, Township 11 South, Range 5 West, commenced September 25, 1955, drilled to a total depth of 17,112 feet at a cost of $609,000.

(5) Amanda Fontenot No. 1 in Section 27, Township 11 South, Range 5 West, commenced October 26, 1955, drilled to a total depth of 13,500 feet at a cost of $503,000.

(6) Louisiana State Rice Milling Unit No. 1 in Section 25, Township 11 South, Range 5 West, commenced February 8, 1956, drilled to a total depth of 14,507 feet at a cost of $917,000.

(7) Louisiana State Rice Milling No. 2 in Section 31, Township 11 South, Range 4 West, commenced March 20, 1956, drilled to a total depth of 16,102 feet at a cost of $562,000.

(8) Benoit No. 3 in Section 36, Township 11 South, Range 5 West, commenced June 27, 1956, drilled to a total depth of 12,306 feet at a cost of $743,-000.

(9) Amanda Fontenot No. 2 in Section 2, Township 12 South, Range 5 West, commenced October 11, 1956, drilled to a total depth of 17,416 feet at a cost of $381,000.

(10) Henderson Unit No. 1 in Section 24, Township 11 South, Range 5 West, commenced December 1, 1956, drilled to a total depth of 15,544 feet at a cost of $760,000.

(11) Lacassane Company No. 2 in Section 3, Township 12 South, Range 4 West, commenced January 7, 1957, drilled to a total depth of 14,746 feet at a cost of $915,000.

(12) E. A. Lyon "B" No. 1 in Section 32, Township 11 South, Range 4 West, commenced June 8, 1957, drilled to a total depth of 15,350 feet at a cost of $1,270,000.

(13) Lacassane Company B01 in Section 32, Township 11 South, Range 4 West, commenced August 1, 1957, drilled to a total depth of 15,510 feet at a cost of $980,000.

(14) B. V. Henderson No. 1 in Section 26, Township 11 South, Range 5 West, commenced August 10, 1957, drilled to a total depth of 10,020 feet at a cost of $80,000.

(15) Amanda Fontenot No. 1-B well in Section 27, Township 11 South, Range 5 West, commenced September 25, 1957, drilled to a total depth of 10,022 feet at a cost of $87,000.

The E. A. Lyon B-1 well in Section 19, Township 11 South, Range 5 West, commenced February 25, 1958, and the Petitjean No. 1 well in Section 24, Township 11 South, Range 5 West, commenced March 8, 1958, are now drilling.

Exclusive of the two wells now drilling in the Thornwell Field, the companies have spent a total of $9,948,000 in the operations in this field, $1,071,000 of which has been spent in drilling operations on the lease in question. At no time since the commencement of drilling of the first well in the vicinity on June 20, 1954, has any period of time elapsed when a well was not either drilling or operations were then in progress for the drilling of a well.

The Court concludes from all the correspondence that defendants have never assumed the attitude that their leasehold rights would be continued in effect

indefinitely as a result of the production from the Fontenot No. 1 well. It is true, as plaintiffs point out, that the Fontenot Well No. 1 lies on the very eastern edge of the property involved, and that much of the exploration hereinabove enumerated was conducted within a five or six-mile area to the East and North of the involved property.

### The Question Presented

The question presented is whether there has been a reasonable and prudent development of the property (2,140 acres).

### The Law

A lessee must conduct its operations to promote the mutual advantage and profit of both lessor and lessee, and to act as would a reasonable and prudent operator under similar circumstances and conditions. Where the lessee has conducted such operations in the past at substantial expense and has evidenced an intention to continue the development of the property or to release the lease, the lease is not necessarily subject to cancellation because of a difference of opinion with the lessors as to the proper amount of drilling operations necessary to constitute reasonableness.

Plaintiffs' case is pegged on the holding of the Louisiana Supreme Court in Wier v. Grubb, 228 La. 254, 82 So.2d 1. Wier is not determinative of the issues involved here, but is authority for the proposition that the determination of whether or not there has been compliance with the development clause is to be resolved only after a consideration of all the facts. We recognize, as did the Supreme Court of Louisiana in Wier, the difficulty of laying down any comprehensive rule which so largely involves one of fact, and the merits of each case must be determined according to its particular circumstances.

The third well drilled on the Fontenot lease was abandoned on October 17, 1957. Fourteen days later, on October 31st, plaintiffs' attorney demanded a release. On December 2nd Austral answered that it had acquired Pan-American's interest and declined to execute a release. On December 5th plaintiffs' attorney demanded additional development "or else suit." In compliance with plaintiffs' demands, 960 acres of the leased lands were released by The Texas Company on January 31, 1958. The present suit was filed on March 6, 1958 —less than five months after the third well was plugged and abandoned. During this period lessees were conducting operations on three other wells in the Thornwell Field. In all of the negotiations between plaintiffs' attorney and the representatives of the defendant lessees, the lessees here recognized their obligation to drill within a reasonable time or give up the acreage. Certainly, this does not evidence a "negative conduct" which the court found in Wier to constitute a violation of the lessees' obligations.

In seeking the answer to the crucial issue as to whether or not the lessee has developed the lease according to the standards of a reasonable, prudent operator, we have considered all the facts. Specifically, we have considered: (a) geological data (b) the number and location of wells drilled both on the leased premises and adjoining lands (c) the productive capacity of producing wells (d) the cost of drilling operations (e) the time interval between the completion of the last well and the demand for additional operations, and (f) the acreage involved in the disputed lease.

Considering all of these factors, and particularly noting that only fourteen days elapsed between the abandonment of the third well and the demand for release, and noting further that only five months elapsed between abandonment of the third well and the date suit was filed, we conclude that the defendants had not (as of the date of the filing of this suit) breached their obligation to develop the property prudently and reasonably. Accordingly, defendants' motion for summary judgment should be granted. It is.

In Wier, two years elapsed between the abandonment of the last well and the filing of the suit. Here, five months had elapsed. We do not wish to lay down any rule of thumb as to time intervals, but on the record here if a period of eighteen months had elapsed we would have been inclined to have granted plaintiffs' motion for summary judgment rather than defendants'. Specifically, this is to say that there is nothing to prohibit plaintiffs from seeking this same cancellation they now seek if further development is not forthcoming.