Ruth Herring NOEL

v.

**AMOCO PRODUCTION COMPANY.**

Civ. A. No. 91–2379.

United States District Court, W.D. Louisiana, Shreveport Division.

June 28, 1993.

---

**15.** *See* each "Form 2106" attached to Exhibits A, B, D, and E in the Record.

**16.** *See* Stipulations # 17, # 18, # 29 and # 30.

**17.** *See* Stipulations # 22, # 23.

**1002**

David Klotz, Bodenheimer, Jones, Klotz & Simmons, Shreveport, LA, for plaintiff.

W. Michael Adams, William Timothy Allen III, and J. Jay Caraway, Blanchard, Walker, O'Quin & Roberts, Shreveport, LA, for defendant.

## MEMORANDUM RULING

STAGG, District Judge.

Plaintiff, Ruth Herring Noel, filed suit in state court on October 14, 1991. On November 5, 1991, pursuant to 28 U.S.C. § 1441, Amoco Production Company removed the dispute to this court. Plaintiff seeks the cancellation of mineral leases, reasonable attorneys' fees and costs. This matter was tried to the bench from April 22, 1993 to April 23, 1993.

This case involves four elderly mineral leases. The first lease was entered into between L.L. Noel, W.B. Noel and the C.W. Lane Company, Inc., as lessors, and O.G. Collins, as lessee, on March 19, 1937.[1] The second lease was entered into between L.L. Noel, James S. Noel and the C.W. Lane

Company, Inc., as lessors, and the Stanolind Oil and Gas Company, as lessee, on February 8, 1954.[2] The third lease was entered into between L.L. Noel, as lessor, and the Stanolind Oil and Gas Company, Inc., as lessee, on April 10, 1956.[3] The fourth lease was entered into between James S. Noel and the C.W. Lane Company, Inc., as lessors, and the Stanolind Oil and Gas Company, as lessee, on April 13, 1956.[4] The third and fourth leases cover the same property and are collectively referred to as the "James S. Noel 'B' lease." Mrs. Noel is currently the owner of an undivided royalty interest in the lands covered by the four leases. Stanolind Oil and Gas Company acquired the rights of O.G. Collins in the W.B. Noel lease, and Amoco is the successor in interest to Stanolind Oil and Gas Company.

In her original complaint, plaintiff seeks the total cancellation of all four mineral leases. With respect to the James S. Noel lease and the James S. Noel "B" lease, plaintiff claims that the leases have expired due to the failure of Amoco to develop the properties as a reasonably prudent operator. With respect to the W.B. Noel lease, plaintiff claims that the lease has expired because production from the lease is not in paying quantities. In her first supplemental and amended complaint, filed on January 15, 1993, plaintiff claims that during the pendency of this suit the James S. Noel lease and the James S. Noel "B" lease also expired because the leases ceased producing in paying quantities.

At the close of plaintiff's case, counsel for the defendant moved for a judgment as a matter of law, under Fed.R.Civ.P. 52(c), on all issues. The court declined to render such a judgment until the close of all evidence, except with respect to the issue of whether the W.B. Noel lease had expired for cessation of production in paying quantities. The court found that plaintiff had failed to prove that production from this lease was below paying quantities on the date that suit was

1. See Ex. P–4. This lease is referred to as the "W.B. Noel lease."

2. See Ex. P–1. This lease is referred to as the "James S. Noel lease."

3. See Ex. P–3.

4. See Ex. P–2.

filed. Accordingly, a judgment as a matter of law was entered in favor of defendant with respect to the W.B. Noel lease. This Memorandum Ruling shall address plaintiff's remaining claims, all of which involve the James S. Noel lease and the James S. Noel "B" lease.

## I. THE FACTS

The James S. Noel lease and the James S. Noel "B" lease have been in effect since the mid 1950's. The James S. Noel lease comprises approximately 299 acres and there are 85 producing wells on the lease. The James S. Noel "B" lease comprises approximately 85 acres and there are 19 producing wells on the lease. All of the wells located on these leases are drilled to the Annona Chalk zone; this zone is located above the top of the Mooringsport formation, which is found at approximately 2,360 feet. No production has ever taken place below the Mooringsport on either of these leases.

Beginning in December 1990 and January 1991, at least two drilling company operators expressed an interest in drilling on the two leases to explore zones below the Mooringsport. In early 1991, J. Marshall Jones, Jr. requested a farmout agreement from Amoco for the northwest ¼ of section 19, T21N, R14W; more than one half of the land in this quarter section is leased under the James S. Noel lease. Later, Mr. Jones requested that the farmout acreage be changed to the south ½ of section 24, T21N, R15W; all of the James S. Noel "B" lease and a large portion of the James S. Noel lease are contained in the north ½ of section 24, T21N, R15W, but none of the leases at issue in this case are included in the south ½ of this section. Mr. Jones testified that his group preferred the south ½ of section 24 to the northwest ¼ of section 19, despite the fact that they had initially requested a farmout on the northwest ¼ of section 19, for two main reasons. First, the south ½ of section 24 was the center of a large block of leases in which his group had acquired a working interest. And

second, the northwest ¼ of section 19 flooded during the spring months.

Effective January 7, 1991, Mr. Jones and Amoco entered into a farmout agreement for the south ½ of section 24. Pursuant to that agreement, Jones caused the Bradford #1 to be spudded on July 5, 1991 and it was drilled to test the Hosston formation at a total depth of 4,190 feet.[5] Production at this depth was determined not to be commercial. The well was then perforated at the Pettit, where production was again found not to be commercial. Then, the well was perforated at the Rodessa Hills zone, where commercial production was found at about 2,930 feet. The Bradford #1 was located approximately 500 to 1,000 feet from the southern boundary of the James S. Noel "B" lease. Mr. Jones testified that his associate, William Plaster, an 89 year old geologist, had long believed that a fault structure was present in the area, and that drilling the Bradford #1 provided Jones Operating Co. and Amoco with geological data confirming the presence of the fault. Production from the Bradford #1 confirmed Mr. Jones' belief that there was a potential for production in the area northeast of this well; in particular, Mr. Jones believed that the Noel leases in the northwest ¼ of section 19 would prove to be commercially productive.

On May 2, 1991, plaintiff wrote Amoco a letter demanding that Amoco commence drilling operations for a Cotton Valley test on the James S. Noel lease within 30 days or release its mineral rights below the Annona Chalk zone.[6] On May 10, 1991, plaintiff wrote a second letter to Amoco and extended her demands to include the James S. Noel "B" lease.[7] On June 11, 1991, Mrs. Noel was advised by Ms. Jeanine Haller, Amoco's land negotiator in charge of the Noel leases, that Amoco was pursuing exploration and development opportunities as to the Cotton Valley and, therefore, that it would not release its mineral rights.[8]

---

5. See Ex. P–13, at page 41; see also Appendix A, attached.

6. See Ex. P–6.

7. See Ex. P–7.

8. See Ex. P–8.

By letter dated July 22, 1991, Mr. Jones requested a second farmout agreement from Amoco.[9] Mr. Jones wanted a farmout agreement for the northwest ¼ of section 19 for all zones below the Annona Chalk formation down to the base of the Hosston formation (approximately 4,500 feet). In response, Amoco approved Mr. Jones' request conditioned upon the drilling of a test well to the Cotton Valley formation (approximately 8,000 feet).[10] Amoco made drilling a well to the Cotton Valley a condition because Mrs. Noel had demanded that Amoco drill to the Cotton Valley earlier that year.

In September 1991, after negotiations between Mr. Jones and Ms. Haller, a farmout agreement for the zones below the Annona Chalk formation down to the base of the Hosston formation in the northwest ¼ of section 19 was executed. Mr. Jones testified that his group had originally planned to drill the well in this section on the James S. Noel lease, but changed their minds when they learned of the demand letter sent by Mrs. Noel and this lawsuit, filed on October 14, 1991. Later in the fall of 1991, Jones Operating Co. drilled a well in the northwest ¼ of section 19 on leased property that was not owned by plaintiff. Under this farmout agreement, Mr. Jones was granted an option to drill a second well in the northwest ¼ of section 19. This option remains valid until 90 days after a decision is rendered in this matter.[11] Mr. Jones has drilled at least 8 other wells in the area surrounding the Noel leases since this suit was instituted. Mr. Jones stated that he did not want to drill on the Noel lease because of the chance that the lease would be cancelled by the court.

On October 14, 1991, when plaintiff filed suit seeking the total cancellation of the James S. Noel and James S. Noel "B" leases, she claimed that Amoco had breached its duty to develop the leased premises as a reasonably prudent operator.

For the eight months immediately preceding the filing of this suit, production from the Noel leases ranged between 1,000 and 1,400 barrels of oil per month.[12] By April of 1992, production from these leases had fallen to about 600 barrels per month.[13] By January of 1993, production from these leases had fallen to less than 200 barrels per month.[14] A dramatic decline in royalties accompanied this reduced production.[15] On January 15, 1993, apparently because of the reduced royalties, plaintiff filed an amended complaint claiming that during the pendency of this suit the James S. Noel lease and the James S. Noel "B" lease expired because the leases ceased producing in paying quantities.

## II. THE OBLIGATION TO DEVELOP THE LEASED PROPERTY

### A. The Law

■ Article 122 of the Louisiana Mineral Code imposes upon the lessee an obligation to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor.[16] This duty is "an adaptation of the obligation of other lessees [under La.Civ.Code art. 2710[17]] to act as 'good administrators.'" *Frey v. Amoco Production Co.,* 603 So.2d 166, 174 (La.1992) (citing La.Rev.Stat. § 31:122, comment; *Waseco Chemical &*

9. See Ex. P-23.

10. See Ex. P-24 & P-25.

11. See Ex. P-26.

12. See Ex. P-14.

13. *Id.*

14. See Ex. P-15.

15. See Ex. P-11.

16. Article 122 is also referred to as La.Rev.Stat. § 31:122. The article states:

> A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.

17. Article 2710 of the Louisiana Civil Code provides:

> The lessee is bound:
> 1. To enjoy the thing leased as a good administrator, according to the use for which it was intended by the lease.
> 2. To pay the rent at the terms agreed on.

*Supply Co. v. Bayou State Oil Corp.*, 371 So.2d 305 (La.App. 2d Cir.), *writ denied*, 374 So.2d 656 (La.1979); and *Williams v. Humble Oil Refinery Co.*, 290 F.Supp. 408 (E.D.La.1968), *aff'd*, 432 F.2d 165 (5th Cir. 1970), *and cert. denied*, 402 U.S. 934, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971)).

> In Louisiana, the general obligation to act as a "good administrator" or "prudent operator" has been clearly specified in four situations: (1) the obligation to develop known mineral producing formations in the manner of a reasonable, prudent operator; (2) the obligation to explore and test all portions of the leased premises after discovery of minerals in paying quantities in the manner of a reasonable, prudent operator; (3) the obligation to protect the leased property against drainage by wells located on neighboring property in the manner of a reasonable, prudent operator; and (4) the obligation to produce and market minerals discovered and capable of production in paying quantities in the manner of a reasonable, prudent operator.

La.Rev.Stat. 31:122, comment. In the present case, plaintiff claims that the defendant has breached its obligation of further exploration.

▪ The obligation of further exploration was first announced by the Louisiana Supreme Court in *Carter v. Arkansas Louisiana Gas Co.*, 213 La. 1028, 36 So.2d 26 (1948), and the jurisprudence since *Carter* has continued to recognize this obligation. La.Rev.Stat. § 31:122, comment. This same jurisprudence, however, has also acknowledged the difficulty of laying down any comprehensive rules with respect to a lessee's obligation of further exploration. Whether the lessee has sufficiently tested and explored the leased premises is "a question of fact which must be resolved by a consideration of the facts and circumstances shown in a particular case." *Carter*, 36 So.2d at 28. Even though the present case is readily distinguishable from *Carter* and its progeny, an examination of the decisions of the Louisiana courts which have addressed this issue is warranted.[18]

In *Carter, supra,* an action for the partial cancellation of a mineral lease was brought against the lessee, Arkansas Louisiana Gas Co. The primary term of the mineral lease had expired, and prior to filing suit the plaintiffs demanded that the lessor either develop the property further or release the property from the terms of the lease. The lessee refused to do either. The lessee acknowledged that it was subject to an implied obligation to develop the property reasonably, but sought to distinguish between exploration and development. The lessee argued that drilling exploratory wells on the undeveloped portion of the leased property would "constitute *exploration* and not *development*." *Carter*, 36 So.2d at 27. The lessee reasoned that it was obliged to develop the known mineral producing formations on the land, and that it had done so, but that it was under no obligation to drill exploratory wells on the undeveloped portions of the property.

The *Carter* court disagreed with the lessee. The court found that the specific obligation to test and explore every part of the leased property was a component of the lessee's general obligation to develop the premises. The court quoted with approval from *Fox Petroleum Co. v. Booker*, 123 Okl. 276, 282, 253 P. 33, 38 (1926):

> The principle, as we understand it, is that development of every part of the lease is an implied condition. Therefore, whether the undeveloped portion be a single tract remote from the rest, or a considerable portion of a very large tract ... it is an

---

**18.** When adjudicating claims for which state law provides the rules of decision, federal courts are bound to apply the law as interpreted by the state's highest court. *Commissioner of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967).

When the state's court of last resort has yet to speak on an issue, as in this case, our task is to determine, to the best of our ability, how that court would rule if the issue were before it. We are therefore bound by an intermediate state appellate court decision only when we remain unconvinced "by other ... data that the highest court of the state would decide otherwise."

*Ladue v. Chevron, U.S.A., Inc.*, 920 F.2d 272, 274 (5th Cir.1991) (citations omitted).

implied condition that the lessee will test every part.

*Carter,* 36 So.2d at 29.[19]

The next case to directly address the issue of the lessee's obligation of further exploration was *Nunley v. Shell Oil Co.,* 76 So.2d 111 (La.App. 2d Cir.1954), *aff'd,* 229 La. 349, 86 So.2d 62 (1956).[20] In *Nunley,* the lessor sought partial cancellation of a mineral lease covering 84 acres. Forty-four of these 84 acres were included in a 640 acre drilling unit established by the Louisiana Department of Conservation. The plaintiff sought the release of the remaining 40 acres on the ground that the lessee had breached its obligation to develop the property. The court, applying the rule set forth in *Carter, supra,* found that the plaintiff had adequately established his right to a cancellation of the lease. The court noted that there had been "an absolute refusal on the part of the defendant [lessee] to engage in any development...." *Nunley,* 76 So.2d at 114. The defendant's opposition to further development was based upon the opinion of its professional geologist who testified that the 40 acre tract would be completely unproductive in the Anthony and Pettit zone with the possible exception of one acre. In contrast, the plaintiff offered evidence that he had been made a bona fide offer of lease involving the payment of a cash consideration and the contingent accrual of an additional sum by a reasonable and prudent operator. The offer also included a provision that required the prospective lessee to drill a well.

The Louisiana Supreme Court revisited the obligation of further exploration in *Wier v. Grubb,* 228 La. 254, 82 So.2d 1 (1955). In *Wier,* the four wells that had been drilled by the lessee were confined to the far eastern end of the leased property. After making several demands on the lessee for further exploration of the property, the lessor brought suit to obtain partial cancellation of the lease. The lessee argued that further drilling was an unreasonable financial gamble because the geological information indicated that it was highly improbable that oil, gas or other minerals would be discovered in paying quantities. The lessee was found to have breached its obligation of further exploration because the evidence indicated that the lessee had no intention of testing or exploring the remaining acreage. The court quoted from *Sauder v. Mid–Continent Petroleum Corp.,* 292 U.S. 272, 280–81, 54 S.Ct. 671, 674, 78 L.Ed. 1255 (1934):

> The justification for the respondent's position is that the geological data and the experience upon surrounding lands are both unfavorable to the discovery of oil or gas upon the eastern half of section 16 (the 320 acre tract). The respondent's officers state that they desire to hold this tract because it may contain oil; but they assert that they have no present intention of drilling at any time in the near or remote future. This attitude does not comport with the obligation to prosecute development with due regard to the interests of the lessor. The production of oil on a small portion of the leased tract cannot justify the lessee's holding the balance indefinitely and depriving the lessor, not only of the expected royalty from production pursuant to the lease, but of the privilege of making some other arrangement for availing himself of the mineral content of the land.

*Wier,* 82 So.2d at 6.

On June 1, 1959, the Louisiana Supreme Court rendered two decisions which ad-

---

**19.** In another often quoted sentence, the court stated that:

> The law of this state is well settled that the main consideration of a mineral lease is the development of the leased premises for minerals, and that the lessee must develop with reasonable diligence or give up the contract; further, that as to what constitutes development and reasonable diligence on the part of the lessee must conform to, and be governed by, what is expected of persons of ordinary prudence under similar circumstances, having due regard for the interest of both contracting

parties. *Carter,* 36 So.2d at 28 (citations omitted).

**20.** *Eota Realty Co. v. Carter Oil Co.,* 225 La. 790, 74 So.2d 30 (1954) was decided by the Louisiana Supreme Court on May 31, 1954. Although the lessor was seeking cancellation of the mineral lease because he believed that the lessee had breached its obligation of further exploration, this decision addressed the issue of whether the lessee had been properly placed in default by the lessor.

dressed the lessee's obligation of further exploration. In one of these cases, the court found that the lessee had breached its obligation, *Sohio Petroleum Co. v. Miller*, 237 La. 1015, 112 So.2d 695 (1959); in the other case, *Middleton v. California Co.*, 237 La. 1039, 112 So.2d 704 (1959), the court found that lessee had not breached its obligation of further exploration. In *Sohio, supra*, the mineral lease involved seven separate tracts of land containing approximately 3,408 acres. Tract 1 had been released by the lessee prior to initiation of the suit. Parts of Tracts 2 and 4 had been included in units created by the Louisiana Department of Conservation. The lessee argued that operations on Tracts 2 and 4 constituted full compliance with its implied obligation to develop the leased property and that such operations were sufficient to maintain the lease in full force and effect as to Tracts 3, 5, 6 & 7. The court, relying primarily on *Carter, supra*, held that the operations on one tract could not maintain the lease as to other undeveloped tracts. The lessee also argued that a farmout contract which it had entered into with a drilling company was sufficient to comply with the lessor's demand for development. The court disagreed, finding that the drilling company had acquired merely the option of drilling on the leased property if and when it completed a well on a nearby tract of land, and did not have a binding obligation to develop any portion of the property.

In *Middleton, supra*, the lessor brought suit to secure the partial cancellation of a mineral lease, which was granted in January of 1937 and covered approximately 4,600 acres of land. From the time that oil was discovered on the property in 1939 up to and including the year 1954, the last full year preceding the filing of plaintiff's suit, approximately 17 million barrels of oil had been produced from the leased property and the lessors had received in excess of $4 million in royalties. This production was obtained from 30 wells, most of which were drilled before 1950; these wells were situated in an area comprising only 400 acres. The lessee, California Co. ("Calco"), had expended more than $7 million in order to obtain this production.

From 1940 to 1952, the lessor appeared to be satisfied with Calco's development of the lease. Beginning in 1952, however, the lessor began to inquire about Calco's plans for further development of the lease. In early 1955, the lessor was contacted by two independent oil operators who were interested in leasing part of the property. In May of 1955, the lessor notified Calco claiming that Calco had defaulted on the lease and demanded that Calco commence drilling operations within 60 days. Calco did not comply with this demand.

In examining whether Calco had reasonably developed the leased property, the court evaluated the way that Calco had "conducted its entire operation in the field; what it [had] done in the past and measures taken by it looking towards the future." *Middleton*, 112 So.2d at 707. The court noted that 3 of the 30 producing wells had been drilled in 1950. In addition to the 30 producing wells, Calco had drilled 4 dry holes on the leased property and seven dry holes on land adjacent to the leased property. Calco drilled dry holes in 1950 and 1952, and continued to gather geological data through the middle of 1954. In the summer of 1954, the geological department of Calco recommended that a well be drilled on an undeveloped area of the leased property. Further geophysical research was conducted through the end of 1954. On July 29, 1955, Calco notified the lessor that the location of a new well had been fixed and that it would be promptly drilled. This notice, however, came more than 60 days after the lessor's May 1955 demand letter. On August 20, 1955, a producing well was completed.

The lessor argued that partial cancellation of the mineral lease was warranted because there had been no drilling on most of the leased property and no new drilling operations at all since 1952. The court disagreed. The court recognized that over the years Calco had

conducted highly successful operations on the land which have redounded to the common advantage of the contracting parties and, before and since 1952, has continued its explorations by making various tests and drilling, and by contributing to the

drilling upon adjacent property, all with the view of securing new production from the leased land.

In this connection it is apt to point out that, considering the large acreage of land covered by the lease, it is apparent that neither the lesser (sic) nor the lessee contemplated that an immediate development of the land was feasible or practicable. And we think it evident that the parties assumed that the securing of production from all parts of the tract would require considerable time after the initial production was obtained.

*Middleton,* 112 So.2d at 709.

Since *Sohio* and *Middleton,* only one Louisiana court has cancelled a mineral lease for a lessee's breach of its obligation of further exploration.[21] In *Morrison v. D & L Partnership,* 499 So.2d 988 (La.App. 3d Cir. 1986),[22] the court held that, under the particular facts presented, the lessee had an obligation to reasonably develop the leased property during the primary term of the mineral lease. The facts of this case were extraordinary: the primary term of the lease was ten years, the lessee paid no initial consideration for the lease, and the lessee had no obligation under the lease to drill or pay rentals from year to year. After concluding that the les-

see had an obligation to develop the leased property during the primary term of the lease, the court then addressed the issue of whether the lessee had breached its obligation.

In *Morrison,* the lessor had completed only one well on the leased property. This well produced only for about two and one-half years, and when it did produce, production was irregular. The court found that the lessee had "no overall program for development of the whole leased premises" and that it was "awaiting a purchaser or other investors." *Morrison,* 499 So.2d at 993. "There was an admission that the partnership would only drill what was necessary to keep the lease alive." *Id.* In contrast, the lessor presented the testimony of two experts. One of the experts testified that "[t]he chances of striking a commercial producer on the leased premises was 75 percent, and he thought that the property offered as good a drillable prospect as one could find." *Id.* at 992. The lessor's other expert testified that such a well should be profitable.

In cases where the lessee's conduct has not been so egregious, Louisiana courts have deferred to the reasonable judgment of the lessee and, accordingly, have given the lessee the benefit of the doubt.[23] In *Dupree v.*

---

21. There have been federal court decisions that have determined that the lessee has breached its obligation of further exploration. In *Cutrer v. Humble Oil & Refinery Co.,* 202 F.Supp. 568 (E.D.La.1962), *aff'd,* 309 F.2d 752 (5th Cir.1962), the court found that the lessee had breached its obligation of further exploration despite the fact that the court acknowledged that there was no evidence whatsoever that prudent development of the lease would require drilling on the leased property at that time, and no witness produced to say that he would drill. Federal courts have also found that the lessee breached its obligation of further exploration in *Humble Oil & Refinery Co. v. Romero,* 194 F.2d 383 (5th Cir.1952); and *Goodrich v. Exxon Corp.,* 642 F.Supp. 150 (W.D.La.1986). These decisions have been criticized by commentators. *See,* 5 H. Williams & C. Meyers, Oil and Gas Law, §§ 842.4, 843.6 & 845.4 (1992); and Thomas A. Harrell, *A Mineral Lessee's Obligation to Explore Unproductive Portions of the Leased Premises in Louisiana,* 52 La.L.Rev. 387, 399 (1991) [hereinafter Harrell].

22. The court acknowledges the decisions rendered in *Dawes v. Hale,* 421 So.2d 1208 (La.App. 2d Cir.1982), *Waseco Chemical & Supply Co. v. Bayou State Oil Corp.,* 371 So.2d 305 (La.App. 2d

Cir.1979), and *Vetter v. Morrow,* 361 So.2d 898 (La.App. 2d Cir.1978), but finds them inapplicable to the issue presented in the present case. In *Dawes,* the factual issue of whether the lessee had breached his obligation to develop the property was not before the court.

The *Vetter* case involved the obligation to develop an existing reservoir, rather than the obligation of further exploration. *See,* Harrell, 52 La.L.Rev. at 400 n. 32. *Waseco Chemical & Supply Co., supra,* also involved a breach of the lessee's obligation to develop an existing reservoir.

23. *See, Fontenot v. Austral Oil Exploration Co.,* 168 F.Supp. 36, 40 (W.D.La.1958), *modified* and *aff'd,* 266 F.2d 956 (5th Cir.1959) ("A lessee must conduct its operations to promote the mutual advantage and profit of both lessor and lessee, and to act as would a reasonable and prudent operator under similar circumstances and conditions. Where the lessee has conducted such operations in the past at substantial expense and has evidenced an intention to continue the development of the property or to release the lease, the lease is not necessarily subject to cancellation because of a difference of opinion with the les-

*Relco Exploration Co., Inc.*, 354 So.2d 1083 (La.App. 2d Cir.1978), the lessor, relying on *Nunley, supra,* argued that his mineral lease should be cancelled for that portion of the leased property which was not included in a producing unit. The court distinguished *Nunley.* "In *Nunley,* the lessee offered no hope to the lessor for future development...." *Dupree,* 354 So.2d at 1084. By contrast, the lessees in *Dupree* had drilled two dry holes on the leased property, participated in the costs of drilling a well in a unit that include acreage on the leased property, and were conducting studies with a view of drilling a deeper test well. The court conclude that

> [i]n view of the defendants' [lessees'] prior efforts to obtain production from the leased acreage at all known producing zones in the area, and their continuing efforts to gather geological information to determine the feasibility of a deep test (13,000 feet) in the reasonably near future, we find defendants have been in good faith in developing the lease as reasonably prudent operators.

*Dupree,* 354 So.2d at 1084.

In *Frazier v. Justiss Mears Oil Co., Inc.*, 391 So.2d 485 (La.App. 2d Cir.1980), the Louisiana Court of Appeal for the Second Circuit reversed the trial court's determination that the lessee had breached its obligation to develop the leased property. The evidence in the case demonstrated that the lessee had directly participated in the drilling of 25 wells in the area around the leased property, only three of which were productive. One of the three producing wells was located on the lessor's property and the production unit created for this well included 60 of the lessor's 160 acres. Further, the lessee had participated in deep tests near the les-sor's property, and had begun to participate in the preliminaries of a play by a major oil company for one or more tests to a much deeper and unproven depth in an area that would have included the lessor's land. In addition, the court held that the fact that other operators may have offered to lease the lessor's property, in the absence of a firm obligation to drill a well, was not alone sufficient to meet the lessor's burden. *Frazier,* 391 So.2d at 488–89.[24]

In addition to the cases discussed above, the operations of a lessee have been considered sufficient to meet the obligation of further exploration under Louisiana law in the following cases: *Fontenot v. Austral Oil Exploration Co.,* 168 F.Supp. 36 (W.D.La.1958), *modified* and *aff'd, Fontenot v. Texas Co.,* 266 F.2d 956 (5th Cir.1959) (although the appellate court agreed with the trial court's finding that the lessees had not breached their obligation of further exploration, the appellate court ordered the lessees to commence further drilling operations within 90 days or forfeit part of the lease); *Taussig v. Goldking Properties,* 495 So.2d 1008 (La. App. 3d Cir.1986), *writ denied,* 502 So.2d 111 (La.1987); *Allen v. Horne, supra; LeJeune v. Superior Oil Co.,* 315 So.2d 415 (La.App. 3d Cir.1975); and *Saulters v. Sklar,* 158 So.2d 460 (La.App. 2d Cir.1963), *writ denied,* 245 La. 638, 160 So.2d 227 (1964).

**B. Discussion**

■ Plaintiff has the burden of persuading this court that a reasonably prudent operator would have investigated the undeveloped portions of the leased premises for the presence of potentially profitable oil and gas deposits, and that her lessee failed to conduct

sors as to the proper amount of drilling operations necessary to constitute reasonableness."); and Harrell, 52 La.L.Rev. at 397 ("The courts have thus recognized that the judgment of the lessee, if exercised reasonably and in good faith, is entitled to considerable weight and in the case of honest doubt should prevail.").

24. *See also, Humble Oil & Refining Co. v. Romero,* 194 F.2d 383, 386 (5th Cir.1952) ("it would not be equitable to permit the merely unsupported statement of a witness, that he would drill if and when he got the lease, to furnish the basis for an absolute order to cancel *nisi*"); and *Allen v. Horne,* 478 So.2d 671, 673 (La.App. 2d Cir. 1985) (allegations of offers from other independent operators to lease and drill, unsupported by evidence of firm commitments, are insufficient to meet the lessor's burden); *compare, Nunley,* 76 So.2d at 115 (evidence of a bona fide offer of lease, which included the payment of cash consideration, the contingent accrual of an additional sum, and a requirement of drilling, was relevant to the court's decision).

such operations.[25] Plaintiff contends that a reasonably prudent operator would have drilled a test well to zones below the Mooringsport. Plaintiff's complaint will be addressed in two parts. First, the court will determine whether a reasonably prudent operator would have investigated the Cotton Valley, and, if so, whether the defendant breached its obligation to conduct such operations. Second, the court will answer these same questions with respect to the zones below the Mooringsport, but above the Cotton Valley.

Plaintiff contends that a reasonably prudent operator would have drilled a test well to the Cotton Valley. In support of her allegation, plaintiff offered the testimony of her oil and gas consultant, Mr. Richard Miller, and Mr. Larry Bach. Mr. Miller was tendered as an expert in the field of oil and gas exploration in the North Louisiana area. Mr. Miller testified that he would like to see a Cotton Valley well drilled on Mrs. Noel's property; Mr. Miller, however, did not support his testimony with any geological evidence. Mr. Miller testified that several operators, including Mr. Marshall Jones and Mr. Larry Bach, had expressed an interest in drilling on the Noel leases below the Mooringsport formation. Plaintiff offered evidence of no other offers to drill a well on the Noel leases. Further, plaintiff presented this court with no evidence of an offer, which included a firm commitment to drill. Evidence of an offer to drill on leased property by a third party, in the absence of a firm commitment to drill a well, is insufficient by itself to meet the lessor's burden.[26]

Mr. Bach was the principal in Bach Energy Corporation, which had operated the Annona Chalk wells on the Noel leases for approximately two years. Mr. Bach testified that, during the spring and summer of 1991, he was interested in drilling to, and was in fact prepared to drill a well to, the Cotton Valley. No evidence was offered to either explain or justify his interest. In other words, in order to drill a well to the Cotton Valley, a reasonably prudent operator would want some tangible geological evidence to support his desire to drill. Further, drilling a well to the Cotton Valley would involve a substantial financial investment. Plaintiff offered no evidence—either financial or geological—to substantiate Mr. Bach's conclusory testimony. Moreover, Mr. Bach admitted under cross examination that he could not drill such a well now.

On the other hand, Mr. Jones testified that he had no desire to drill to the Cotton Valley. He testified that he had no data to support the commercial viability of a Cotton Valley well, and that dry holes had been drilled to the Cotton Valley in section 30, T21N, R14W, and in section 13, T21N, R15W. Drilling a well to the Cotton Valley is significantly more expensive than drilling to the Hosston, and a producing well from the Cotton Valley would be unitized by the Louisiana Commission of Conservation. Mr. Jones stated that a block of about 640 acres would have to be formed to drill such a well. In a block, all of the leaseholders in an area join together and contribute to the drilling of a well. Mr. Jones testified that Amoco did not own all of the deep rights in the area, and that he did not know of any other leaseholder in the area that was interested in participating in drilling such a well. Additionally, Mr. Jones testified that gas prices during the summer of 1991 were about $1.00 per thousand cubic feet, and that drilling a well to the Cotton Valley was not economically feasible at that price.

During cross-examination, counsel for Mrs. Noel attempted to establish that Mr. Jones has an interest in the outcome of this suit by bringing up the fact that Mr. Jones has a continuing option to drill a second well on the James S. Noel lease in the northwest ¼ of section 19 if the lease is not cancelled by this court. While the court agrees with the inference drawn by counsel, the court also acknowledges that such an agreement evinces the continuing desire of both Amoco and Mr. Jones to develop the Noel leases.

---

25. Under Louisiana law, the lessor bears the burden of proving the grounds for cancellation of a mineral lease. *Frazier v. Justiss Mears Oil Co.*, 391 So.2d 485, 486 (La.App. 2d Cir.1980) (citing *Cox v. Cardinal Drilling Co.*, 188 So.2d 667 (La. App. 2d Cir.1966)); *see generally,* Harrell, 52 La. L.Rev. at 397–98.

26. *See supra* note 24 and accompanying text.

■ Like the testimony of Mr. Bach and Mr. Miller, the testimony of Mr. Jones is unsupported by any geological or economic data. Like Mr. Miller, Mr. Jones has an interest in the outcome of this case. However, the lessee does not bear the burden of proof on this issue. With the exception of the unsubstantiated testimony of Mr. Miller and Mr. Bach, plaintiff has offered no evidence to support her claim that a reasonably prudent operator would have drilled a well to the Cotton Valley. For the reasons stated above, this testimony is insufficient to meet plaintiff's burden.[27]

■ Plaintiff also contends that a reasonably prudent operator would have drilled a well to any formation below the top of the Mooringsport, but above the Cotton Valley, that the defendant was capable of drilling such a well within 60 days of her May, 1991 demands, and that the defendant failed to drill such a well. The defendant argues that it was engaged in exploratory activities at the time of plaintiff's demands and that but for her lawsuit it would have caused a well to have been drilled no later than the end of 1991.

■ In the Louisiana cases that have addressed the lessee's obligation of further exploration, none of the lessees have drilled a well within the period provided for by their lessors' demand letters. If the lessees had done so, then the lessors in those cases would not have filed their respective complaints. Yet in most of the cases surveyed by this court, the lessee was found not to have breached its obligation. Under Louisiana law, therefore, it is well established that a lessee may fulfill its obligation of further exploration with conduct short of drilling a well.[28] The question presented in this case, as in all cases, is whether the operations conducted by the lessee were sufficient to fulfill its obligation of further exploration.

■ In determining whether the lessee has reasonably developed the leased property, a court should consider the lessee's entire operation, including its past operations and the measures that it has taken for future development.[29] Relevant factors for the court to consider include:

> (1) geological data; (2) number and location of the wells drilled both on leased lands and adjoining property; (3) productive capacity of wells; (4) costs of drilling operations compare with profits; (5) time interval between completion of the last well and the demand for additional operations; and (6) acreage involved in the disputed lease.[30]

In the present case, Mrs. Noel appears to have been satisfied with Amoco's development of the leases prior to 1991.[31] Amoco had drilled over 100 producing wells to the Annona Chalk zone on less than 400 acres of leased property; these operations had provided Mrs. Noel with substantial royalties over the years. Sometime in late 1990, however, independent operators became interested in drilling to the Hosston, Pettit and Rodessa Hills formations in the area which included the Noel leases. Naturally, Mrs. Noel was interested in having her leases explored at these lower depths.

The January 1991 farmout agreement between Marshall Jones and Amoco did not include portions of either the James S. Noel lease or the James S. Noel "B" lease because

---

27. The court notes that the lessor should not have the burden of proving that a reasonably prudent operator would have drilled a well. Rather, it is possible for the lessor to meet its burden by showing that a reasonably prudent operator would have investigated the leased premises for the presence of potentially profitable oil and gas deposits by means short of actual drilling. *See*, Harrell, 52 La.L.Rev. at 400–01. Plaintiff, however, argued only that the lessee should have drilled a well to the Cotton Valley. Accordingly, this court's holding is so limited.

28. *See also*, Harrell, 52 La.L.Rev. at 400.

29. *Middleton*, 112 So.2d at 707.

30. *Vetter*, 361 So.2d at 900 (citing Comment, Implied Covenants in Louisiana Mineral Leases as Affected by Conservation Legislation, 27 Tul. L.Rev. 353, 357–58 (1953)). Adoption of these factors by the *Vetter* court was criticized by Professor Harrell. *See*, Harrell, 52 La.L.Rev. 390–91 n. 5.

31. If Mrs. Noel was dissatisfied with Amoco's development of the leases prior to 1991, she presented this court with no evidence indicative of her discontent.

Mr. Jones believed that the best location for the first well was approximately 500 to 1,000 feet from the southern boundary of the James S. Noel "B" lease. It is important to note, however, that by drilling this well, both the operator and Amoco received geological data which would assist them in developing the mineral leases in this area, particularly the Noel leases. The results of this well also provided plaintiff with geological data which would assist her.

In May of 1991, approximately 4 months after Amoco had farmed out land adjacent to the Noel leases for an exploratory well and approximately two months before this well was spudded, Mrs. Noel demanded that Amoco commence operations for the drilling of a Cotton Valley test on the Noel lease within 30 days. In June of 1991, Amoco notified Mrs. Noel that it was pursuing exploration opportunities with respect to the Cotton Valley. In August of 1991, Amoco attempted to condition Mr. Jones' second farmout agreement on the drilling of a test well to the Cotton Valley. As explained earlier, drilling to the Cotton Valley was both economically infeasible at the time and imprudent in light of the fact that none of the other leaseholders wanted to participate in drilling such a well.

In September of 1991, Amoco executed a second farmout agreement with Mr. Jones; this farmout covered the northwest ¼ of section 19, which included part of the James S. Noel lease. On October 14, 1991, Mrs. Noel filed suit seeking the total cancellation of the Noel leases. Mr. Jones testified that his group would have preferred to have drilled the first well of their September 1991 farmout agreement on the James S. Noel lease, but that they would not commit the resources necessary to drill such a well on a lease that was being questioned by the lessor. Mr. Jones stated that he tried to get the plaintiff to rescind her demands, but was unsuccessful. Mr. Jones drilled a well in the northwest ¼ of section 19 on property that was not owned by Mrs. Noel. The well was spudded sometime in January of 1992; production from this well is currently not commercial.

As part of this farmout agreement, Mr. Jones acquired the right to drill a second well in the northwest ¼ of section 19. This option continues in effect until 90 days after a final decision is rendered by this court. Mr. Jones testified that he plans to drill this well on the James S. Noel lease, provided of course that the lease is not cancelled by this court.

On October 16, 1991, Amoco executed a third farmout agreement with Mr. Jones. This agreement covered the south ½ of the northeast ¼ of section 24, T12N, R15W; this 80 acre tract was located solely on the Noel leases. The farmout agreement provided that the drilling of a test well to the Pettit formation would begin on or before November 15, 1991 and be complete within 30 days.[32] Both Ms. Haller and Mr. Jones testified that they did not know that Mrs. Noel had filed this suit when this agreement was executed.

Execution of a farm-out agreement between the lessee and a third party drilling company that merely grants the third party the option of drilling on the leased property if and when a well is completed on a nearby tract of land has been held to be insufficient to comply with a lessor's demand for development.[33] In *Sohio, supra,* however, this was the only action that the lessee had taken. In the present case, an exploratory well was actually drilled within 500 to 1,000 feet of the southern boundary of the Noel leases. Further, the testimony established that at least one, and perhaps two, wells would have been drilled on the leased property but for the plaintiff's lawsuit. Accordingly, the facts and circumstances presented by this case distinguish it from *Sohio, supra.*

In addition, Ms. Haller testified that Amoco had drilled a test well to the Hosston formation in 1974 and had conducted extensive field geological work on the Noel leases in 1982. Ms. Haller stated that Amoco did not execute a release of the mineral rights on the Noel acreage because it was negotiating farmout agreements of the property covered by these leases with Mr. Jones.

---

**32.** See Ex. P–22.

**33.** *Sohio,* 112 So.2d at 700.

Despite the fact that Amoco appears to have been less than diligent in conducting exploratory activities on the Noel leases between 1982 and 1990, the evidence establishes that Amoco had resumed such activities by late 1990. Louisiana courts have held that a lessee has breached its obligation to explore and test all portions of the leased lands only where the lessee has denied the existence of any such obligation,[34] or where the evidence has demonstrated a persistent refusal on the part of the lessee to explore and test the productive potential of the property.[35] This is not the case here. Instead, the court finds that the facts of this case are more analogous to *Middleton, supra,* and *Frazier, supra,* where the lessees were exploring, and otherwise developing, the leased property, but were not doing so to the complete satisfaction of their lessors.

In *Frey v. Amoco Production Co.,* 603 So.2d 166, 173 (La.1992), the Louisiana Supreme Court reiterated the rule that "a lease arrangement is in the nature of a cooperative venture in which the lessor contributes the land and the lessee the capital and expertise necessary to develop the minerals for the mutual benefit of both parties." The court also noted that "[b]y virtue of the beneficial relationship between the lessee and the lessor, the former avoids having to pay up front for the privilege of exploration, and the latter, assuming a passive role, is guaranteed participation in any eventual yield accruing from the lessee's entrepreneurial efforts, unconstrained by financial and operational responsibilities." *Id.* Clearly, the jurisprudence interpreting the lessee's obligation of further exploration does not require the lessee to drill a well every time the lessor makes a demand. Rather, the cases hold that the lessee is required to do only that which a reasonably prudent operator would do to explore the leased premises for potentially profitable deposits of oil and gas. Undoubtedly, there are times when a reasonably prudent operator would drill a well; at other times, however, a reasonably prudent operator might pursue less expensive means of exploration.

In sum, the plaintiff argues that the defendant should have drilled a test well on her property. With the exception of the wells—at least one of which the operator wanted to drill on Mrs. Noel's property—which were drilled in the area surrounding her leases after her demand letter, plaintiff has offered this court no evidence, geological or otherwise, to support her argument that a well should have been drilled. On the other hand, the lessee has shown that, prior to the plaintiff's demand, it was negotiating with an independent operator to drill a test well on the Noel acreage. Additionally, a test well was drilled on adjacent property shortly after the plaintiff's May 1991 demands; this well provided the parties geological data relevant to the Noel acreage. The lessee also executed two farmout agreements, which included property covered by the Noel leases. In the September 1991 farmout, the plaintiff's property was the preferred location; in the October 1991 farmout, the plaintiff's property was the only property farmed out. Accordingly, the court finds that plaintiff has failed to meet her burden of proof on this issue. Therefore, with respect to the issue of whether the defendant breached its obligation of further exploration on the James S. Noel and James S. Noel "B" leases, judgment is entered in favor of defendant.

## II. PRODUCTION IN PAYING QUANTITIES

█ Plaintiff claims that during the pendency of this lawsuit the James S. Noel lease and the James S. Noel "B" lease expired for cessation of production in paying quantities. Amoco denies that production on the leases is below paying quantities. Alternatively, Amoco argues that if production has fallen below paying quantities it is the direct result of plaintiff's original complaint, in which she questioned the validity of both leases in their entirety.

34. *See, Carter v. Arkansas Louisiana Gas Co.,* 213 La. 1028, 36 So.2d 26 (1948); and *Sohio Petroleum Co. v. Miller,* 237 La. 1015, 112 So.2d 695 (1959).

35. *See, Wier v. Grubb,* 228 La. 254, 82 So.2d 1 (1955); *Morrison v. D & L Partnership,* 499 So.2d 988 (La.App. 3d Cir.1986); and *Nunley v. Shell Oil Co.,* 76 So.2d 111 (La.App. 2d Cir.1954); *see generally,* Harrell, 52 La.L.Rev. at 403.

As stated earlier, production from the Noel leases ranged between 1,000 and 1,400 barrels of oil per month for the eight months immediately preceding the filing of plaintiff's original complaint. By January of 1993, the month that plaintiff filed her supplemental and amended complaint, production from these leases had fallen to less than 200 barrels per month. Mr. James Morris, the operations manager for Louisiana Petroleum Operating Company, was in charge of maintaining and operating the Annona Chalk wells on the Noel leases. Mr. Morris testified that the expenses to operate the James S. Noel and the James S. Noel "B" leases exceeded the revenues derived from these leases for the period beginning in May 1992 and ending in February 1993. Mr. Morris did not distinguish between fixed and variable costs.

Mr. Morris testified that only 9 of the 85 wells capable of production on the James S. Noel lease are currently producing; additionally, only 6 of the 19 wells capable of production on the James S. Noel "B" lease are currently producing. Mr. Morris testified that his company was continuing to operate the wells on these leases, but that it was not maintaining the wells. The operating company was unwilling to make the cash expenditures necessary to maintain the wells in working order while the lessor was continuing to question the validity of the leases. Consequently, when a well would break down, the operating company would shut the well down rather than repair it.

Mr. Morris also testified that most of the wells needed to be reworked. The cost of reworking a Chalk well averages about $2,300 to $3,000 per well, and a well can be reworked in about ½ a day. Mr. Morris believed that, in the absence of this lawsuit, his company could earn a profit from operations on the James S. Noel and James S. Noel "B" leases.

In her original complaint, plaintiff sought the *cancellation*, not the *partial cancellation*, of the James S. Noel lease and the James S. Noel "B" lease. Article 142 of the Louisiana Mineral Code specifically provides that a "mineral lease may be dissolved partially or in its entirety." By seeking the *cancellation*

of the leases, rather than the *partial cancellation* of the leases below the Mooringsport formation, plaintiff called into question the validity of the leases in their entirety. The issue presented by this case is whether a lessor, who calls into question the entirety of her mineral lease for reasons other than the cessation of production in paying quantities, has the right to complain thereafter when production drops below paying quantities because of the lessee's decision not to expend the funds necessary to maintain the lease during the pendency of the lawsuit. In other words, should the lessee be expected to continue to invest its resources in the leased property when the lessor claims that the lease has expired?

In *Lelong v. Richardson*, 126 So.2d 819, 829–30 (La.App. 2d Cir.1961), the Louisiana Court of Appeal for the Second Circuit found that "the lessees were prevented from continuing development of the leased premises by reason of the institution of this suit for cancellation and forfeiture instituted by plaintiff-lessor." Additionally, "where a lessor questions the validity of a lease, the [primary] *term of the lease* is suspended, the logic being that the lessee has been deprived of the exercise of the rights granted to him by the act of the lessor and he is therefore granted an extension *beyond the primary term* for the period *during the primary term* when the lease was placed in jeopardy." *Hanszen v. Cocke*, 246 So.2d 200, 203 (La. App. 2d Cir.1971).

Although there appear to be no Louisiana cases addressing the particular issue presented by this case, the court finds the *ratio decidendi* of *Lelong, supra* and *Hanszen, supra* applicable to this case. The rationale of these cases, particularly *Lelong*, is that the lessee should not be punished for the breach of an obligation which is brought about by the lessor's act of questioning the validity of the lease. In this case, the operator was "caught between a rock and hard place." He could either spend the money to maintain the wells in good operating condition and hope the lease would be upheld, or he could decide not to spend the money and risk having an otherwise valid lease cancelled for cessation of production in paying quantities. Equity

demands that the lessee and its operator be extracted from this precarious position.

The court concludes that the institution of suit by the lessor for the total cancellation of the Noel leases prevented, for all practical purposes, the lessee and its operator from maintaining and repairing the producing wells on the leases. Accordingly, the court holds that under the facts and circumstances of this case the lessor is estopped from complaining about any alleged cessation of production in paying quantities that is the result of the lessee's failure to maintain and repair the wells during the pendency of this suit by the lessor. Therefore, with respect to whether the James S. Noel lease and the James S. Noel "B" lease expired for cessation of production in paying quantities, judgment is rendered in favor of defendant.

A judgment consistent with the terms of this Memorandum Ruing shall issue herewith.

THUS DONE AND SIGNED.

APPENDIX A

JAMES S. NOEL LEASE
JAMES S. NOEL 'B' LEASE
W. B. NOEL LEASE