SAUNDERS, J.
This case arises from the negligent installation of a security system which resulted in an undetected burglary and exhorbitant losses to the plaintiffs who purchased the system from Sonitrol Security Systems of Calcasieu, Inc., (hereinafter Sonitrol). The trial court found no negligence and, therefore, no liability on behalf of Sonitrol. For the following reasons, we reverse,

FACTS

Gary Klumpp, principal owner of the Sportsman Store of Lake Charles, Inc., (hereinafter Sportsman) contacted Stewart Keith Cayton, in March, 1989, concerning hthe design and installation of a security system for a new pawn shop business located on Highway 14 in Lake Charles, Louisiana. After meeting with Mr. Klumpp and inspecting the new premises, Mr. Cayton offered three security system options: (1) a digital dialing system, (2) a direct wire system, and (3) a cellular system. At that time, the cellular system was very expensive and thus, not a real option for Mr. Klumpp. The direct wire system provided for protection if the phone lines were cut or the system lost power in that the system’s central monitoring would be alerted immediately. With the digital dialing system, there is no way to communicate through the central station if the telephone line is cut. Following this explanation, Mr. Klumpp choose the digital dialing system because of financial expense.
On or about March 14, 1989, the parties entered into a contract for the design, installation and monitoring services for a security system. Defendants contend that the installation of the system was completed before the signing of the contract because it needed to be signed and dated on the date that the system actually went into service. In addition to this contract, the parties also entered into a limited warranty concerning the security system.
The premises were burglarized sometime between the evening of June 21, 1990, and the morning of June 22, 1990. The burglars first cut all of the telephone wires to the building. Secondly, they either pried the security system’s warning siren off of the wall with a crowbar or knocked it down with a fire extinguisher, then proceeded to cut the wires to shut off the siren. Since both the phone lines and the siren wires had been cut, no one was alerted. The intruders then pried the doors open, entered the store, and proceeded to steal a number of items either *77 owned by the Sportsman or by customers who had pawned the items to secure loans.
¡¡The burglars were not locksmiths, nor were they escape artists, and they had no particular expertise in their chosen profession. They used brute force to disarm the alarm system, brute force to enter the building, and brute force to break into the safe. Their methods were rudimentary, predictable, and clumsy, however, they were enough to defeat the system sold by Sonitrol to the plaintiff.
On June 10, 1991, the Sportsman filed suit against Sonitrol and Stewart Keith Cayton for negligent design and installation of the system at plaintiffs place of business and negligent representations as to the adequacy of the security system sold to the plaintiff. They also claimed that insurance coverage and/or warranty coverage was provided through the sales agreement. Also named in this suit as a defendant was Cassidy Insurance and Real Estate Agency, Inc., which claim was settled prior to trial.
The trial court held that Sonitrol and Stewart Keith Cayton were not negligent and, therefore, not liable for any of plaintiffs damages, dismissing the action at plaintiffs cost. Plaintiff appeals citing five assignments of error:
1. The trial court erred in failing to find a defect in the design or installation of the Sonitrol system.
2. The trial court erred in finding that Gary Klumpp designed the Sonitrol system installed at The Sportsman Store.
3. The trial court erred in finding that neither Sonitrol Security Systems of Calcasieu, Inc., nor Stewart Keith Cay-ton provided any insurance coverage that would be applicable to the losses sustained by the plaintiff without addressing the issue of fraud on the part of Mr. Cayton.
4. The trial court erred in failing to find gross negligence on the part of defendants.
5. The trial court erred in failing to award damages to plaintiff.
¡¡Each assignment will be addressed in turn subject to the manifest error standard of review. Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a fact finder’s determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See Mart v. Hill, 505 So.2d 1120 (La.1987).

ASSIGNMENTS OF ERROR NUMBERS 1 AND 4

Appellant claims that the trial court erred in failing to find that the defendants defectively designed and/ or installed the security system. This ruling by the trial court was based primarily on expert testimony offered by the defendant’s experts.
The duty-risk negligence analysis considers five separate elements: (1) whether the defendants had a duty to conform their conduct to a specific standard (the duty element); (2) whether the defendants’ conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendants’ substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) whether the defendants’ substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and, (5) whether there were actual damages (the damages element). Roberts v. Benoit, 605 So.2d 1032 (La.1991); Fowler v. Roberts, 556 So.2d 1 (La.1989).
feThus, we must first undertake a determination of whether the defendant owed a duty to design or install the digital line system in a particular manner that would have prevented the loss.
Mr. Midkiff and Mr. Cayton testified for defendants and were certified as experts “in the design and installation of Sonitrol Security *78 Systems.”([1]) Both testified that the security system at issue was designed and installed correctly providing coverage to 100% of the store premises, and was a standard Soni-trol system.
However, plaintiffs expert witness, David Salmon, Ph.D., criticized the system’s design and installation. Dr. Salmon was certified as an “expert in the field of security and evaluation of burglar alarms and systems.” He identified three critical flaws in the system. First, the telephone lines on which the system depended were exposed and clearly visible, thus making circumvention simple. Secondly, the siren was placed outside above the front door between twelve to fourteen feet from the ground, also exposed, visible, and vulnerable to unwanted intrusion. Thirdly, the failure to include wiring and hardware within the building made it easy to disable the system.
Dr. Salmon agreed with the defense experts that with a digital line system the security of the phone lines is essential to ensure notification to the central station of any intrusion. With such a system, if the phone lines are cut, then the only deterrent left is the siren. Thus, both components are essential to the proper functioning of the ^system. Dr. Salmon testified regarding three different standards common in the security systems field: (1) General Service Administration (GSA) standards, (2) Underwriters Laboratory (UL) standards, and (3) industry standards. He stated that the security system installed by Sonitrol failed to meet any of the three standards.
A weighty difference of opinion arose between the experts regarding the duty to protect the phone lines. Dr. Salmon testified that according to all industry standards, the phone lines should be in some way protected to ensure that they could not be easily cut.
He additionally suggested that the installer had a duty to either warn the consumer that the phone lines should be encased or call the telephone company and have the wires encased or buried. Without such precautions, the entire system would be rendered useless. At trial, Dr. Salmon explained several options available to protect the phone lines:
Q So it’s either recommending that the owner do something with them, right?
A Yes, sir.
Q Or requesting that the phone company do something with them?
A Yes, sir.
Q Have you in the past in your personal experience dealt with the situation like this where there have been exposed phone lines?
A Several times.
Q Have you dealt with the phone company in asking them to secure those lines, to protect them?
A Yes, sir. On residences I find or small businesses I find quite often they’ll just do it with no charge.
Q Do what?
A Run the wire, bring it in where you want to bring it, help you mask it, run it to an alternate pole. So I’m not confusing, maybe frthis will help, if I make it a little more succinct. The first thing you want to do is just make it difficult to find the phone line. All right. So you bring it from not the pole that’s closest but two poles down the street, and you’re going to maybe bury that in a short depth burial, like in this case there’s a trench back there and some houses so you just push it underground and bring it up through a phony water pipe or through some oth *79 er conduit that looks like a water pipe or something, or you just shield it with a very heavy steel pipe just to protect it so nobody will know what it is. So that’s the first thing, just masking it. Second is, if you’re not going to mask it, to put it in conduit so it comes out of the box but it’s metal conduit going into the ground like Mr. Midkiff, their expert, talked about doing.
Q To simply wrap it in metal conduit.
A Wrap it in metal conduit and protect it, because now you’ve got to cut it and you want to create in this person’s mind “am I cutting into a high powered line that’s going to electrocute me, or what is this thing,” you know, but you’re buying time.
He further mentioned another alternative such as having an additional set of phone lines left exposed as decoys, and having the phone company wire another replacement set to confuse potential intruders.
Mr. Cayton, on the other hand, testified that by law he was not allowed to touch the phone lines and that, in any event, protection of these lines were not his responsibility. He did admit, however, that protecting the phone lines would have been a smart thing for someone to have done. Mr. Midkiff testified that it was his practice to advise customers to have the phone lines encased if he noticed they were exposed. Thus, it is evident that Sonitrol and its representative, Mr. Cayton, were aware that the phone company should be contacted to better protect the phone lines from circumvention. Neither Mr. Midkiff nor Mr. Cayton testified as to industry standards nor in any way challenged the testimony of Dr. Salmon to the effect that the installation in the present case failed to meet industry standards.
The next criticism by Dr. Salmon involved the failure to protect the siren. All experts agreed that the purpose of the siren in a digital line system is to serve as a fcback up in the event that the phone lines are cut. The box holding the siren was affixed to the sheet metal of the building with only four metal screws. During the burglary, the siren was shut down by merely bashing it with a fire extinguisher or prying it from the wall knocking it off its mount and cutting the wires.
Among the experts, there was a huge divergence of opinion as to whether the siren was adequately protected. Dr. Salmon stated that the first preference is to affix such a siren inside the building where it is more difficult for burglars to tamper with. He stated that alternatively, if the box enclosing the siren was to be placed outside, it should have been welded to the exterior or mounted more securely than with four metal screws. He suggested that the box, if placed outside, could be enclosed in metal bars to provide more security. In response to this, Mr. Cay-ton testified that the placement of the siren outside was a matter of his personal preference. He further said that he felt that four metal screws were sufficient to hold the box in place. The defendants’ other expert, Mr. Midkiff, testified that he preferred that the siren be placed inside. Once again, both Mr. Midkiff and Mr. Cayton gave no testimony to suggest that the installation met any industry standards.
The last major disapproval noted by Dr. Salmon was that metal conduit should have been placed around the wires leading from the interior of the building to the siren such that the wires could not have been so easily cut. Mr. Cayton stated that he did not encase the wires here since they were enclosed inside the box and could only be tampered with if the box was pried off the wall.
Dr. Salmon elaborated regarding the three flaws as follows:
Q Now you said that all three of these things you testified violated the most minimal level of standards.
A Yes, sir.
Q In any of these deviations rise to a level of gross negligence?
bA They do, yes, sir.
Q Which ones?
A There’s two that I see, and I think they’re in combination. I think one is making the bell exposure like it was; in other words, making it too easy to defeat, i.e., taking something locally at hand, fire extinguisher knocking it off. *80 That in combination with having exposed wires along the back that you could also just simply cut or pull off the wall. That combination rises to the level of gross negligence in my opinion.
Q In your professional opinion had the bell been put in another way, whether inside, more protected, or in conduit, would that have prevented this burglary?
A We’d a caught them. I say “we,” the Lake Charles Police Department would’ve caught them or run them off.
Q Or the bell would’ve run them off?
A Yes, sir.
Q Had the telephone lines been protected or hidden or moved, in your opinion, would those steps have prevented this incident or increased the odds of apprehension?
A If you have one or the other, if I understand your question, in other words, had they cut the wires in the back and been going around to the front which we think is the scenario, and then the bell sounded, and then they attacked the bell but not been able to find it or not knock it off the wall — In other words, you hit it with the fire extinguisher but the spot welds or the cage or whatever stops you from doing it, they would’ve pounded on it for — this is typical for these kid of guys — they would’ve pounded on it for 10, 15 seconds and then they would’ve been gone. And they would not have had the time to devote to defeating the burglar bars in the windows, and the safe certainly.
Ultimately, the fact finder must evaluate conflicting expert opinions in relation to all the circumstances of the case. James v. Gordon, 95-1472 (La.App. 3 Cir. 12/4/96); 690 So.2d 787, writ denied, 97-0756 (La.5/1/97); 693 So.2d 738, citing Gibson v. Bossier City Gen. Hosp., 594 So.2d 1332 (La. App. 2 Cir.1991) and the cases cited therein. When the experts’ opinions are in conflict concerning compliance with the applicable standard of care, the trial court’s determinations on hothis issue will be granted great deference. It is the sole province of the trier of fact to evaluate the credibility of such experts and their testimony. Charpentier v. Lammico Ins. Co., 606 So.2d 83 (La.App. 3 Cir.1992).
The jurisprudence is well settled that where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review, even though the reviewing court may feel that its own evaluations and inferences are as reasonable. Rosell, 549 So.2d 840. Where the fact finder chooses between two permissible views of the evidence, its choice cannot be manifestly wrong. Id. We are further mindful that when the trier of fact’s conclusions are based upon credibility determinations, the manifest error standard requires us to give great deference to the trier of fact. Melancon v. LaRocca, 94-639 (La.App. 5 Cir. 1/31/95); 650 So.2d 371. However, while the court of appeal is bound to accord deference to the fact finder, especially on findings based on credibility determinations, the court of appeal also has a constitutional duty to review facts and to determine if findings are clearly wrong based on the evidence. Skarbino v. State Farm Mut. Auto. Ins. Co., 96-566 (La. App. 3 Cir. 1/8/97); 690 So.2d 73.
In the instant case, we find the trial court manifestly erroneous in its reliance on the defendants’ experts’ determination that Soni-trol owed no duty to warn that the phone lines should be encased or buried, no duty to encase the siren wires, and no duty to enclose the siren itself in a more substantial apparatus in order to make it tamper-resistant or to locate the siren box on the interior of the building.
The defense experts were only certified as experts within the realm of Sonitrol Security Systems, they were not experts in the security industry as a whole, and thus were only qualified, at best, to testify as to how their company, Sonitrol Security Systems, designs and installs security systems. They were not certified to testify as Into how the process is normally completed on an industry wide basis, and thus could not accurately testify as to any general duty owed to the plaintiff. On *81 the other hand, plaintiffs expert was certified as an expert throughout the industry. Moreover, his testimony as to the violation of industry standards was totally uncontradict-ed and is found to be both logical and reasonable by this court.
The defendants did nothing to controvert the testimony of Dr. Salmon regarding industry standards. Neither of their experts testified as to either industry standards or “Soni-trol standards.” To the extent that they are in disagreement with Dr. Salmon, they base their opinions solely on “personal preference” and not on any recognized standard of care.
Sonitrol owed Sportsman a duty commiserate with those of the industry in which they operate. In failing to warn that the phone lines should be encased or buried, in failing to encase the siren wires, and in failing to enclose the siren in a more durable box and secure it firmly to the building, they breached this duty. This breach rendered the security system inadequate, leaving the burglary undetected, resulting in a huge loss of inventory.
We now turn to Sonitrol’s contention that, even if found negligent, their liability is contractually limited. The client contract relied upon by Sonitrol states in pertinent part:
3. THE WARRANTIES SET FORTH HEREIN ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY, OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. THE CLIENT ACKNOWLEDGES THAT NO OTHER REPRESENTATIONS WERE MADE TO IT OR RELIED UPON BY IT WITH RESPECT TO THE QUALITY AND FUNCTION OF THE GOODS.
[[Image here]]
Ii25. DEALER SHALL NOT BE LIABLE FOR ANY GENERAL, DIRECT, SPECIAL, EXEMPLARY, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, CLIENT acknowledges that any affirmation of fact or promise made by DEALER shall not be deemed to create an express warranty: That DEALER does not make any representation or warranty, including any implied warranty of merchantability or fitness that the system or service supplied may not be compromised, circumvented, or the system or services will in all cases provide the signaling, monitoring and response for which it was intended: That CLIENT is not relying on DEALER’S skill or judgment in selecting or furnishing a system suitable for any particular purpose. Some states do not allow limitations on how long an implied warranty lasts or the exclusion or the limitation of incidental or consequential damages, so the above limitations or exclusions may not apply to you. This warranty gives you specific legal rights and you may also have other rights which may vary from state to state.
[[Image here]]
14. LIMITATIONS OF DAMAGES:
C. CLIENT understands and agrees that if DEALER should be found liable for any loss damage due from a failure to perform any of its obligations or a failure of the equipment to properly operate, DEALER’S liability shall be limited to a sum equal to the total of one-half year’s monitoring payments, or five hundred dollars, whichever is the lesser, and this liability shall be exclusive and shall apply if loss or damage, irrespective of cause or origin, results directly or indirectly to persons or property from performance or non-performance of any of DEALER’S obligations or from negligence, active or otherwise, or DEALER, its employees and agents.
Although these cited portions of the contract would, at first, appear to absolve Soni-trol of any liability, La.Civ.Code art.2004, which provides for circumstances that will nullify contract clauses, states, in part: “[a]ny clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.”
The question to be resolved in this appeal is, therefore, whether the actions of Sonitrol were mere negligence for which it is not liable or intentional misconduct or gross fault which would be outside the scope of the exculpatory clauses. Our review hof the rec *82 ord shows that, although Sonitrol’s actions do not rise to the level of intentional misconduct, due to cumulative acts of negligence by Soni-trol in installing the system, their acts do constitute gross negligence.
The Louisiana Supreme Court in Ambrose v. New Orleans Police Amb. Serv., 93-3099 (La.7/5/94); 639 So.2d 216, 219-220 defined gross negligence as follows:
Louisiana courts have frequently addressed the concept of gross negligence. Gross negligence has been defined as the “want of even slight care and diligence” and the “want of that diligence which even careless men are accustomed to exercise.” State v. Vinzant, 200 La. 301, 7 So.2d 917 (La.1942). Gross negligence has also been termed the “entire absence of care” and the “utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others.” Hendry Corp. v. Aircraft Rescue Vessels, 113 F.Supp. 198 (E.D.La.1953) (applying Louisiana law). Additionally, gross negligence has been described as an “extreme departure from ordinary care or the want of even scant care.” W. Page Keeton, et. al., Prosser & Keeton on the Law of Torts, Sec. 34, at 211 (5th ed.1984); 65 C.J.S. Negligence, Sec. 8(4)(a), at 539-40 (1966 & Supp.1993). “There is often no clear distinction between such [willful, wanton, or reckless] conduct and ‘gross’ negligence, and the two have tended to merge and take on the same meaning.” Falkowski v. Mauras, 637 So.2d 522 (La.App. 1st Cir.), writ denied, 629 So.2d 1176 (La.1993) (quoting Prosser & Keeton, supra, at 214). Gross negligence, therefore, has a well-defined legal meaning distinctly separate, and different, from ordinary negligence.
We find that the cumulative acts of negligence by Sonitrol in installing the system constitute such an extreme lack of ordinary and reasonable care as to comprise gross negligence. The methods employed by the intruders to defeat the system were obvious and predictable, even by those not well versed in the operation of security systems. The primary means used to defeat any security system is to cut the phone lines. Soni-trol was negligent in failing to either advise Mr. Klumpp of the condition and danger of the exposed telephone lines or to call the phone company and have the lines protected or hidden from view. Had this precaution been taken, the main warning system would have alerted others to the break in immediately.
^Following evasion of the main warning system, the backup system was overcome by knocking down the warning siren and disabling those wires. Sonitrol was negligent in failing to take adequate steps necessary to guard the warning siren from such interference. Had the siren been more securely fastened to the wall, encased in steel, or located inside the premises, the noise from the siren would have signaled others to the scene or frightened the intruders away before they had time to penetrate the windows and doors of the store. Further, had these wires been encased or located in the interior of the building, they would not have been vulnerable to cutting.
Thus, had either the main warning system or the back up system been installed to function properly, the burglary would have been detected and the loss would never have occurred. Sonitrol’s complete want of care in its installation of all aspects of this system indicates a total indifference to the job of safeguarding property, an end which Sonitrol was paid to accomplish. Thus, we hold that the contractual provisions purporting to limit Sonitrol’s liability do not apply because they were grossly negligent in installing the system.
Additionally, every sale carries with it the statutory warranty that the thing sold is free of hidden defects or redhibitory vices which applies by operation of law, but may be waived by the buyer. La.Civ.Code art. 2476; Matthis v. Couvillion, 613 So.2d 1024 (La.App. 3 Cir.1993). A valid waiver of warranty requires all of the following: (1) it must be written in clear and unambiguous terms; (2) it must be contained in the sales document; and, (3) it must be brought to the attention of the buyer or explained to him. Matthis, 613 So.2d 1024; Thibodeaux v. Meaux’s Auto Sales, Inc., 364 So.2d 1370 (La.App. 3 Cir.1978); Dixie Roofing v. Allen Parish Sch. Bd., 95-1526 (La.App. 3 Cir. *83 5/8/96); 690 So.2d 49. The record is void of any ^evidence indicating that the limitations of liability were explained to Mr. Klumpp or that they were ever brought to his attention. Mr. Klumpp testified that when he signed the contract following the installation of the system, he thought that he was signing a contract indicating that the installation was complete. There is no indication that the limited liability clauses were ever explained to Mr. Klumpp by Mr. Cayton or any Soni-trol representative, thus the waiver of warranty is invalid.
Further evidence that the limited warranty policy was not explained properly can be surmised from Mr. Cayton’s testimony at trial. Mr. Cayton stated as follows:
Q Isn’t it trae that what you tell anybody or told anybody that you talked with at the time was that you were giving them this $5,000.00 manufacturer’s warranty that’s in evidence, and what that means is that if there’s forcible entry that goes undetected and unreported Sonitrol or we’re liable for the first $5,000.00 and your E & N coverage is everything above that?
A There are certain requirements for the Sonitrol limited warranty to even be in effect and the Errors & Omissions policy is a completely separate policy that has to do with either some error being made in the installation of the system or the operation from the central station of receiving an alarm and not doing anything with it. It’s completely separate from anything else. I’m not an insurance salesman.
(Emphasis ours.)
This testimony, in effect, contradicts the limited warranty language in the contract.
This court finds it unlikely that any buyer would agree to sign this contract had the provisions been fully disclosed. With this contract Sonitrol attempts to memorialize their product as something not fit for any purpose and thus relieve itself from liability for its want of care. One wonders why any buyer would agree to purchase such a system and pay monthly fees, knowing that it is not warranted to be fit for the purpose intended. Such broad overreaching language which is clearly used to take advantage of unsophisticated purchasers is not favored by this court and will be condoned, if at all, only when it is shown that all requisites are clearly met. A |i6purchase made “as is /where is” may be appropriate at a flea market or garage sale, however, in the marketing of security systems, it is at least circumspect.

ASSIGNMENT OF ERROR NUMBER 2

We also find the trial court was manifestly erroneous in its determination that Gary Klumpp designed the Sonitrol system installed at the store. Except for his testimony that he wanted the loudest bell possible, the record contains no evidence of any involvement by Mr. Klumpp in the design of the Sonitrol security system. There is no evidence in the record indicating that Mr. Klumpp had anything to do with the design or installation of the security system, that he was consulted in any way as to whether to place the siren inside or outside, or whether to encase or otherwise protect the phone lines. Indeed, defendants concede in brief before this court that “Stewart Keith Cayton designed the security system, including the determination of the location of what detection equipment to use and the location/placement of the equipment in the premises.”

ASSIGNMENT OF ERROR NUMBER 3

The appellant also contends that the trial court erred in finding that there was no fraudulent conduct by Mr. Cayton with regard to the insurance coverage provided by Sonitrol. This contention seems to be that Sonitrol told the plaintiff that they had insurance and based on this fraudulent conduct, they should be held to be insurer of their product. We hold that the trial court was not manifestly erroneous in its determination that defendants were not guilty of fraud.
Mr. Klumpp testified that Mr. Cayton indicated to him that he would be insured for up to $1 million by Sonitrol. He also believed that the insurance premium for the policy was included in the costs of the monthly payments he made to Sonitrol. InMr. Cayton testified that he used the insurance coverage as a selling tool. Mr. Cayton’s deposition *84 statement were brought out at trial as follows:
What I tell anybody that I talk with is that if you allow me to come to this building fully, like I proposed, then I’m allowed to offer you the manufacturer’s $5,000.00 warranty, which states in 25 words or less that if for any reason forcible entry is made into your building that goes undetected by us and unreported to the police, we’re liable for the first $5,000.00 of your loss. At that point, I then carry Errors and Omissions insurance and I have a million dollars in an Errors & Omissions policy that will sit on top of this warranty to cover you to a million dollars beyond the warranty. That is the way I use it all the time.
The trial court could have accepted the testimony of either Mr. Klumpp or Mr. Cayton on .this point. We find no manifest error in the acceptance of the testimony of Mr. Cayton, rather than Mr. Klumpp and his subsequent conclusion that the plaintiff failed to prove fraud. Accordingly, on this issue we affirm.

ASSIGNMENT OF ERROR NUMBER 5

If the fact finder does not reach an issue because of an earlier finding which disposes of the case, the appellate court, in reversing the earlier finding, must make a de novo determination of undecided issues from the facts in the record. Craven v. Universal Life Ins. Co., 95-1168 (La.App. 8 Cir. 3/6/96); 670 So.2d 1358, writ denied, 96-1332 (La.9/27/96); 679 So.2d 1355. In the present case, the trial court never reached the issue of damages for lost profits suffered by plaintiff, thus, we now undertake a de novo review of that issue.
In State, DOTD v. Dietrich, 555 So.2d 1355 (La.1990), the supreme court set forth guidelines to calculate business losses in expropriation cases, which are analogous to the situation faced here. The court stated in part:
Where economic losses suffered by a business have been proven, damages for incidental and consequential loss must be awarded to fully compensate the owner.
[[Image here]]
[gProof of economic loss may be determined by various methods, and it may exceed the market value of the property. However, the method employed for proof of loss must demonstrate by a preponderance of the evidence that an actual loss was sustained by the business because of the taking. In addition, the award may reflect the economic effect of protracted judicial proceedings. State Through Department of Highways v. Constand[Constant], 369 So.2d 699 (La.1979).
Where an expert’s well-reasoned testimony supports an award of damages, where it is uncontradicted and, particularly where it is accepted by the trier of fact, the property owners should prevail. City of Shreveport v. Standard Printing Co., 441 So.2d 737 (La.1983).
Id. at 1359. Both plaintiffs expert and defendants’ expert employed a calculation similar to a Dietrich calculation in assessing lost profits and in fact, refer to this formulation as the Dietrich method.
Plaintiffs expert, Daphne Clark, reviewed several items in making her calculations including tax returns from 1986-1991, annual ledger books, inventory lists, surveys of six area pawn shops and information from the National Pawn Brokers Association. She provided the court with two damage calculations. Under the first method, using a method called capitalization of an income stream in which losses were trended out for twenty-five years, she forecasted economic losses to be $474,000.00 as of October 20,1997.
For the second calculation, Ms. Clark used what she referred to as the Dietrich method. The first step in this calculation was establishing the normalization of the 1990 income period in an attempt to predict what the 1990 income would have been had the burglary never occurred. She arrived at a base year income of $29,559.00. This figure is increased every year by a growth factor which included inflation plus a real growth rate. Once the expert decides how many years to extend these losses, the loss is totaled and then decreased to the present value of these losses. Ms. Clark estimated the growth factor to be ten percent extended the losses for nine years, and barrived at a total of $458,-000.00 as of October 20, 1997. Her testimo *85 ny was left unscathed by the defense on cross examination.
The defense expert, Mr. Meyers, used what he termed a discount of earnings approach method to calculate the value of the store on the day before the burglary. He calculated the business value of the store on that day to be $98,988.00. Cross examination brought out two significant flaws in his calculations. First, it was revealed that he deducted taxes twice, which skewed his calculations resulting in a lowered base year income of only $17,224.00. Secondly, he failed to take into account the market of the inventory in the store at the time of the burglary. Mr. Klumpp testified that when he took in merchandise such as jewelry or guns from a customer, he would only loan twenty percent of its value in exchange. Later, if the customer did not return for the merchandise within a specified period of time, Mr. Klumpp would sell it for full market value. He testified that he sold jewelry for between 200% and 700% of its purchase (loan) price. Thus, the market value of the goods sold by Mr. Klumpp was much greater than the amount he loaned to the customers, none of which was taken into consideration by Mr. Meyers.
Our review of this testimony convinces us that $98,988.00, which was less than the market value of the store’s inventory on the date of the burglary, would not fully compensate the plaintiff for his losses.
When asked about Ms. Clark’s Dietrich calculation, Mr. Meyers was in general agreement as to the professional acceptability of her methodology and accuracy of her computation, disagreeing only as to her use of a nine year rather than an eight year loss extension and as to her handling of advertising expenses, albeit she followed the more conservative approach in this instance also. When Ms. Clark made a recomputation using Mr. Meyer’s figures, the end result was a reduction in damages bpof less than 1%. Ultimately, we accept Ms. Clark’s estimate of damages for loss profits as we find her testimony to be well-reasoned, thorough and precise, and to follow faithfully the principles enunciated in Dietrich. Accordingly, we award damages in the amount of $458,000.00 as of October 20,1997, with legal interest from that date.

DECREE

The judgment of the trial court is reversed. Plaintiff is awarded damages in the amount of $458,000.00 as of October 20,1997. As plaintiffs expert included interest in her calculations through October 20, 1997, plaintiff is awarded legal interest from October 20, 1997, until paid. Defendants are assessed with all costs of these proceedings at the trial level and on appeal.
REVERSED AND RENDERED.

. While we note that there is no testimony with reference to the standard of care required by Sonitrol Systems, per se, we further note that the limited warranty agreement entered into evidence suggested that Sonitrol Systems are not warranted to meet industry standard or, indeed, any standards. When a system is sold without "warranty of merchantability or fitness that the system or service supplied may not be compromised, circumvented, or the system of services will in all cases provide the signaling, monitoring and response for which it was intended,” this court has a great deal of difficulty deciding what value can be given to the testimony of persons qualified as experts in installation of a system which is warranted, in effect, to be fit for nothing. This observation notwithstanding, for purposes of this review, we have considered the testimony of defendants’ witnesses as if they had been properly qualified as experts in at least this company’s industry practices.