731 So.2d 1049 (1999)
EDMUNDSON BROTHERS PARTNERSHIP and Elizabeth Edmundson, Plaintiffs-Appellees,
v.
MONTEX DRILLING COMPANY, The Succession of Moncrief and Glickenhaus Energy Company, Defendants-Appellants.
No. 98-1564.
Court of Appeal of Louisiana, Third Circuit.
May 5, 1999.
*1050 Marc Dupuy, Jr., Marksville, Guy Earl Wall, James Louis Weiss, New Orleans, for Edmundson Brothers Partnership, et al.
M. Hampton Carver, Marshall Taylor Darden, Stacy Smith Brown, New Orleans, for Montex Drilling Co., et al.
Before: DOUCET, C.J., SAUNDERS and SULLIVAN, JJ.
DOUCET, Chief Judge.
The Defendants, W.A. Moncrief, Jr., the Succession of W.A. Moncrief, Montex Drilling Company and Glickenhaus Energy, appeal a judgment by the trial court canceling two mineral leases and awarding damages in connection therewith. The Plaintiffs, Edmundson Brothers Partnership and Elizabeth Edmundson (the Edmundsons), answer the appeal.

I. BACKGROUND
The Edmundsons own the property at issue in Avoyelles Parish, consisting of two tracts which are burdened by two separate mineral leases. The Edmundson Brothers Partnership (Edmundsons) now own 50% of the minerals in these properties. Prior to 1977, Ernest E. Edmundson, Jr. owned the entirety of the minerals. On February 28, 1977, he conveyed one-half of all oil, gas and other minerals on the properties to Thomas A. Durham. The remaining one half mineral interest owned by Ernest Edmundson, Jr. was conveyed to his wife, Elizabeth Diggs Edmundson on July 19, 1986. Mrs. Edmundson indicated that this was done for estate planning purposes. On May 15, 1992, Mrs. Edmundson conveyed the minerals to the Edmundson Brothers Partnership, again for estate planning purposes.
On May 28, 1975, Ernest E. Edmundson, Jr., to whom the Plaintiffs are successors in interest, granted an oil, gas and mineral lease on 1765.60 acres to Shell Oil Company (the Shell Lease). W.A. Moncrief *1051 later acquired the Shell Lease and, in 1984, drilled the Edmundson # 2 well (EE# 2) on it.
On June 14, 1980, Ernest E. Edmundson, Jr. and his wife, Elizabeth Diggs Edmundson granted an oil, gas and mineral lease on 1194.54 acres to Durham Enterprises, Inc. (the Durham Lease). W.A. Moncrief acquired the Durham Lease and drilled the Edmundson # 1 well (EE# 1) in 1983.
Both EE# 1 and EE# 2 were vertical wells drilled to the Austin Chalk formation and production was obtained.
On December 10, 1991, Elizabeth Diggs Edmundson, through her attorney, wrote a letter to W.A. Moncrief contending that Moncrief had not properly explored and/or developed the oil, gas and minerals on the two leases. Demand was made upon Moncrief to develop the properties. The parties conducted meetings, with Tom Durham, who was apparently representing Moncrief. By correspondence dated February 13, 1992, from Tom Durham to the plaintiff's attorney, the Defendants were advised that Moncrief was going to develop the property in accordance with the demand letter. Moncrief drilled the EE# 22-1 well on the Shell Lease. The well was drilled horizontally in the Austin Chalk formation. This well was completed on March 27, 1992.

II. TRIAL COURT PROCEEDINGS
In June of 1993, Plaintiffs instituted this litigation setting forth claims which the trial judge in his written reasons for judgment enumerated as follows:
1. Moncrief failed to reasonably develop and explore the Shell Lease.
2. Moncrief failed to reasonably develop and explore the Durham Lease.
3. That the Shell Lease should be canceled for lack of production in paying quantities.
4. That the Durham Lease should be canceled for lack of production in paying quantities.
The petition was later amended to allege that Moncrief fraudulently concealed the expiration of the Shell Lease by falsely reporting production from the EE# 2 well in December 1987.
The case was tried by a judge beginning April 2, 1997. The trial lasted eight days. The trial court handed down extensive written reasons for judgment in which it comprehensively outlined the evidence adduced at trial and delineated its findings. The court rendered judgment pursuant to the written reasons canceling both leases as to the Plaintiffs.
The court further awarded damages in connection with the Shell Lease as follows:
B. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment is hereby rendered in favor of Elizabeth Edmundson and Edmundson Brothers Partnership and against W.A. Moncrief, Jr., the Succession of W.A. Moncrief, Montex Drilling Company and Glickenhaus Energy Corporation, in soldio, (sic) in the following amounts:
1. Lost leasing revenue-$441,250.00 as damages for lost leasing revenues plus legal interest thereon from the date of judicial demand, (June 28, 1993) until paid;
2. Lost production revenue$183,303.72 as damages for lost production revenues attributable to the Edmundson No. 2 well through December 2, 1997 plus legal interest thereon from the date those revenues were received by defendants until paid; and
3. Future well revenue
(a) Fifty (50%) percent of all revenues from the Edmundson No. 2 well from and including January 1998 forward, without deduction of costs, together with legal interest thereon from the date those revenues were received by defendants until paid;
(b) Fifty (50%) percent of all revenues from Edmundson No. 22-1 well from judicial demand, June 28, 1993 until *1052 December 1, 1997, after deducting costs and royalties paid, with legal interest from those revenues were received by defendants until paid; and
(c) Fifty (50%) percent of all revenues from the Edmundson No. 22-1 well from December 1, 1997 forward, without deduction of costs, together with legal interest thereon from the date those revenues were received by defendants until paid.
With regard to the Durham Lease, the trial court awarded damages as follows:
B. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Judgment is hereby rendered in favor of Elizabeth Edmundson and Edmundson Brothers Partnership and against W.A. Moncrief, Jr., the Succession of W.A. Moncrief and Montex Drilling Company, in solido, in the amount of:
1. Lost leasing revenue $208,125.00 as damages for lost leasing revenue and legal interest thereon from the date of judicial demand, June 28, 1993 until paid; and
2. Future Well Revenue
(a) Fifty (50%) percent of all revenue from the Edmundson No. 1 from date of judicial demand, June 28, 1993, until December 1, 1997, after deduction of costs and royalties paid, with legal interest from the date received until paid; and
(b) Fifty (50%) percent of all revenues from the Edmundson No. 1 well from December 1, 1997 forward, without deduction of costs, together with legal interest thereon from date those revenues were received until paid;
The court further awarded costs and attorney's fees.
The Defendants appeal. The Plaintiffs have answered the appeal. For clarity, we will consider the arguments concerning each lease separately.

III. DURHAM LEASE
There are three issues before this Court involving the Durham Lease, these being:
Did the drilling of the EE# 22-1 well on the Shell Lease serve to develop the Durham Lease? Were the Defendants sufficiently put in default for failing to develop the Durham Lease? And finally, did the Durham Lease produce in paying quantities?
These issues will be discussed separately.

A. Did the Drilling of the EE# 22-1 Well on the Shell Lease Serve to Develop the Durham Lease?

The Defendants argue that the trial judge erred in finding that the EE# 22-1 well did not develop the Durham Lease. The Defendants assert that evidence establishes that the drilling of the EE# 22-1 well on the Shell Lease fulfilled their obligation to develop the Durham Lease.

1. Law.
In Taussig v. Goldking Properties Co., 495 So.2d 1008, 1014-15 (La.App. 3 Cir. 1986), writ denied, 502 So.2d 111 (La. 1987), this court discussed a mineral lessee's duty to develop the producing formation:
After production in paying quantities has been obtained from a mineral formation, it is the duty of the lessee to develop the producing formation as a reasonably prudent operator, taking into consideration both his own interests and those of the lessor. To fulfill the development duty under the law, a lessee has the obligation to develop known mineral producing formations in the manner of a reasonable, prudent operator and to explore and test all portions of the leased premises after discovery of minerals in paying quantities in the manner of a reasonable, prudent operator. Vetter v. Morrow, 361 So.2d 898 (La.App. 2nd Cir.1978). Public policy dictates the necessity of the principle of "reasonable *1053 development" to give effect to the parties' intent in confecting a mineral lease, to assure the reasonable development of Louisiana's natural resources, and to prevent the removal of property from commerce. Dawes v. Hale, 421 So.2d 1208 (La.App. 2nd Cir.1982). Therefore, under R.S. 31:122 there is an implied covenant of every mineral lease that the lessee has a duty to develop the leased premises.
The Louisiana Supreme Court in Carter v. Arkansas Louisiana Gas Co., 213 La. 1028, 36 So.2d 26, 28 (La.1948) (emphasis added), set out the standard for determining whether a lessee has fulfilled its duty to develop:
The law of this state is well settled that the main consideration of a mineral lease is the development of the leased premises for minerals, and that the lessee must develop with reasonable diligence or give up the contract; further, that as to what constitutes development and reasonable diligence on the part of the lessee must conform to, and be governed by, what is expected of persons of ordinary prudence under similar circumstances and conditions, having due regard for the interest of both contracting parties. Pipes v. Payne et al., 156 La. 791, 101 So. 144; Stubbs et al. v. Imperial Oil & Gas Co., 164 La. 689, 114 So. 595; Logan v. Tholl Oil Co., et al., 189 La. 645, 180 So. 473. See also Merrill, The Law Relating to Covenants Implied in Oil and Gas Leases, 2d Ed., sec. 122, p. 280, sec. 123, p. 284; 2 Summers, Oil and Gas, Perm.Ed., sec. 414, p. 370.
In the leading case of Brewster v. Lanyon Zinc Co., 8 Cir., 140 F. 801, 814, it was said:
"* * * Whether or not in any particular instance such [reasonable] diligence is exercised depends upon a variety of circumstances * * *. Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required. * * *"

Whether in any given case the lessee has sufficiently developed the leased property pursuant to the rule set out above, is a question of fact which must be resolved by a consideration of the facts and circumstances shown in the particular case. This is clearly shown by the statement of Mr. Justice Van Devanter, who was a circuit judge, in the case of Brewster v. Lanyon Zinc Co., supra, 140 F. at page 813, that there is `* * * difficulty of laying down any comprehensive rule in respect of a question which is so largely one of fact that it must be resolved in each case according to its particular circumstances * *'

2. Evidence and Testimony
The testimony in regard to whether EE# 22-1 developed the Durham Lease is conflicting. Among those testifying was Charles B. Moncrief, son of W.B. Moncrief and his partner in the oil and gas production business. He testified that EE# 22-1 was drilled in response to the demand for development. W.B. Moncrief confirmed that the well had been drilled in response to the demand for development. He stated that the well was located so that, if unitized, it would take 480 acres out of each of the Durham and Shell tracts. He testified that he had spent seventy-five million dollars developing oil and gas properties in the area. He admitted that the EE# 22-1 well was not a good producer and as such, was a disappointment.
Bill R. Hise was qualified as an expert in the field of petroleum engineering. He was retained by the Defendants to examine, among other issues, the question of the development of the Durham Lease. He opined that the information regarding the development of the Shell Lease was pertinent to the evaluation of the Durham Lease. He explained that EE# 22-1 was drilled only about 330 feet from the boundary of the Durham Lease. It was his opinion that EE# 22-1, having been *1054 drilled horizontally, developed approximately 960 acres. He felt that EE# 22-1 combined with the EE# 1 and 2 wells developed about 2560 acres or 85% of the total area of the two leases.
Also testifying was Bruce Sallee, owner of a 50% interest in the minerals on the Durham and Shell tracts. He is an engineer with experience in the field of oil field and reservoir examination. He owns Texas Petroleum Investment Company, which currently operates oil and gas properties. He agreed that the EE# 22-1 well had development potential for the Durham Lease, even though it is not located on the Durham tract because, had the well been successful, it would have been unitized, and the unit would have included both tracts.
David Schell, qualified as an expert geologist, testified on behalf of the Plaintiffs. He concluded from his analysis that the EE# 22-1 did not adequately test the Austin Chalk formation in that it was, in all probability, not drilled in the proper place and was not drilled in the proper zone of the Austin Chalk trench. He opined that the EE# 22-1 did not develop the Durham Lease at all.

3. Trial Court's Findings
The trial judge, stated his finding on this issue in very articulate written reasons, as follows:
The development of the Durham Lease consisted of the drilling of the EE# 1 Well in 1983. During the early 90's this Well was in process of depleting its reservoirs. No other Wells were drilled on this Lease, which Lease consisted of several tracts totalling in excess of eleven hundred acres. The drilling of one Well on an eleven hundred acre tract within ten years, certainly is not reasonable development.
Defendants contend that the drilling of the EE# 22-1 Well on the Shell Lease constitutes development of the Durham Lease. Defendants put forth a very strong and rational argument.
However, their argument, to this Court, is without merit. This finding is based on the following:
1) In response to plaintiff's demand for development, Moncrief notified plaintiff's that two Well locations were being staked for drilling purposes, one on the Shell Lease and one on the Durham Lease. The correspondence indicated that the locations would be staked within one week (plaintiff's Exhibit 103). This did not occur.
2) Instead of the staking of locations of each of the Leases, Moncrief chose to drill the 22-1 Well on the Shell Lease. This Well was drilled horizontally in the Austin Chalk formation. Moncrief contends that this Well developed the Durham Lease. This Court disagrees. The production from the 22-1 Well paid royalty to plaintiff based on the 1/8th royalty provision of the Shell Lease. There were no payments under the royalty provisions of the Durham Lease. (3/16th) Additionally, the 22-1 Well was not unitized.
3) As stated in CARTER V. ARKANSAS LOUISIANA GAS COMPANY, (213 La. 1028, 36 So.2d 26), the drilling of two Wells on a Lease during a ten year existence of a Lease is not reasonable development of the Lease.
4) Defendants contend that all of Moncriefs (sic) drilling operations in Avoyelles and St. Landry Parish constitute development of the area and development of the Durham Lease. This Court disagrees. These wells developed the tracts upon which they were drilled. An argument could be made that this "development" deleted the Durham Lease.
The trial court also disagreed with the Defendants' contention that the factors enunciated in the Goodrich v. Exxon Co., USA, 608 So.2d 1019,1023 (La.App. 3 Cir. 1992), writ denied, 614 So.2d 1241 (La. 1993) supported a finding that EE# 22-1 *1055 developed the Durham Lease. This court in Goodrich, 608 So.2d at 1023, stated that:
The jurisprudence has articulated six factors which are especially pertinent in considering whether a lessee has breached his development obligation. Vetter; Frazier v. Justiss Mears Oil Co., Inc., 391 So.2d 485 (La.App. 2d Cir.), writ denied, 395 So.2d 340 (La. 1980); Comment, 27 Tul.L.Rev. 353, at 357-358 (1953). Those six factors are:
Geological data;
Number and location of wells drilled on or near the leased property;
Productive capacity of existing wells; Cost of drilling compared with profit reasonably expected;
Time interval between completion of last well and demand for additional operation; and
Acreage involved in the lease under consideration.
The trial court utilized the Goodrich factors, in its reasons for judgment, as follows:
In considering all factors that the Court is to consider in determining whether a lessee's development has been reasonable, this Court finds that the factors, as applied to this case, are favorable to plaintiff. This is based on the following:
a) Geological data: The geological data clearly indicates that there is a potential for development in the Austin Chalk Formation, Wilcox Formation, and Tuscaloosa Formation. Moncrief's own testimony confirms his desire to keep the Leases in this area due to the potential. The formation of and existence of the "AMI'S" clearly indicates that many oil companies and/or oil men believe that there is sufficient geological data to develop this region. One well in ten (10) years is not developing the area as per the geological data.
b) Number and location of Wells drilled on or near the lease property: The EE# 1 was drilled on the Durham Lease and the EE# 2 drilled on the Shell Lease, which Leases are adjacent to each other. Additionally, the EE# 22-1 Well was drilled on the Shell Lease. Three Wells on 3,000 acres within 10 years is not sufficient to develop such a large tract.
c) Existing Wells: The EE# 22-1 Well did produce and it was extremely close to the Durham Lease. The failure to produce profitably was due to the drilling operations which were conducted, not due to the lack of presence of oil. Other Wells in the area indicate production capacity. However, this well was drilled in response to a demand for development.
d) Costs of drilling compared with profit reasonably expected: These factors are dependent on the depth of and type of Well. Also, this considers drilling practices. Austin Chalk or Wilcox Wells had been profitable before. The evidence confirms that cost to Moncrief was never at issue.
e) Time between completion of last Well and demand for additional operations: The demand came about approximately six years after the last drilled Well. Considering the size of the tract and prior production, further development should have occurred earlier, especially considering all other activity in the area.
f) Acreage involved in the disputed Lease: Approximately 1,196 acres comprised the Durham Lease. This is considered a large tract of land. One well on this tract in ten (10) years does not develop the Lease.
Accordingly, this Court finds that Moncrief did not reasonably develop the Durham Lease, with a specific finding that the EE# 22-2 Well did not develop the Durham Lease.
We agree with the findings of the trial court. Where, as here, the appellate court is called to review findings of fact made by *1056 a trier of fact, those findings may not be overturned absent manifest error. See Rosell v. ESCO, 549 So.2d 840 (La.1989). After reviewing the record, we hold that the trial court's finding that EE# 22-1 did not develop the Durham Lease is reasonable in light of the record reviewed in its entirety. Finding no manifest error, we may not overturn this determination.

B. Were the Defendants Sufficiently Put in Default for Failing to Develop the Durham Lease?

The Defendants assert that the Plaintiffs have not stated a cause of action with regard to failure to develop the Durham Lease because they did not put the Defendants in default as required by the terms of the lease and La.R.S. 31:135-136[1] before filing suit.

1. Law
In Taussig, 495 So.2d at 1014-15 (emphasis in original), this court explained the need for a putting in default in connection with a claim of failure to develop, as follows:
Since the duty to develop is an implied obligation, the jurisprudence has consistently held that a breach of this duty is passive, and a formal placing in default is required before judicial intervention may be sought. Trinidad Petroleum v. Pioneer Natural Gas, 416 So.2d 290 (La. App. 3rd Cir.), writ denied, 422 So.2d 154 (La.1982); Pipes v. Payne, 156 La. 791, 101 So. 144 (1924). In Pipes, supra, a landmark case in the area of nondevelopment of the lease, the court stated:
"Under these circumstances, we think that plaintiff, before suing to have the contract declared forfeited, should have made demand on defendants to further develop the property, and should have given them a reasonable time within which to have done so. In other words, plaintiff should have put defendants in default. In this connection, it may be observed that it is said in Thornton on Oil and Gas (3d Ed.) Sec. 182, p. 302, that:

`If the lessor desires to declare a forfeiture of the lease for the reason that the land has not been fully developed, although the lessee has entered and developed a part of it, he must give notice to such lessee of his intention to declare a forfeiture if the lease is not fully developed, and reasonable time must be given for the development.'"
The purpose of the default requirement in this context is to provide the lessee notice that the lessor considers the lessee's actions (or inaction) as violative of the implied obligation to develop the leased premises, and to afford the lessee a reasonable opportunity to perform its development obligations. Pipes, supra.

2. Evidence and Testimony
On December 10, 1991, Elizabeth Edmundson, then owner of the minerals, through her attorney, sent a letter to W.A. *1057 Moncrief which included a demand for development of the Durham Lease and the Shell Lease. Insofar as the Defendants contend that the drilling of EE# 22-1 on the Shell Lease developed the Durham Lease, they also argue that therefore, the Plaintiffs needed to make another demand for development to fulfill the requirement that they be put in default before filing suit.
Having found that EE# 22-1 did not develop the Durham Lease, we find that it follows that the Plaintiffs' original demand for development served to put the Defendants in default. As the court stated in Bennett v. Sinclair Oil & Gas Co., 275 F.Supp. 886 (W.D.La.1967), affirmed, 405 F.2d 1005 (5th Cir.1968). "Landowners... need not `hound' their lessees to carry out their obligation ..., but a bona fide demand by landowners is necessary."
Therefore, we find that the requirements of La.R.S. 31:136 were fulfilled by the demand letter of December 10, 1991.

C. Did the Durham Lease Produce in Paying Quantities?

The Defendants first contend that the trial court erred in finding that the Durham Lease should be canceled for failure to produce in paying quantities.
La.R.S. 31:124 provides in pertinent part that:
When a mineral lease is being maintained by production of oil or gas, the production must be in paying quantities. It is considered to be in paying quantities when production allocable to the total original right of the lessee to share in production under the lease is sufficient to induce a reasonably prudent operator to continue production in an effort to secure a return on his investment or to minimize any loss.

1. Appropriate Time Period to Be Considered.
The Defendants argue that in determining whether the Durham Lease produced in paying quantities the trial court should not have considered revenues and expenses incurred after the suit was filed. In support of this proposition they cite the following language from Noel v. Amoco Production Co., 826 F.Supp. 1000, 1015 (W.D.La.1993): "[A] lessor is estopped from complaining about any alleged cessation of production in paying quantities that is the result of the lessee's failure to maintain and repair the wells during the pendency of the suit by the lessor."
After examining the Noel case, we find that it does not stand for the proposition that a court may never consider the post suit period in determining production in paying quantities. Further, Noel is easily distinguishable on its facts from the matter before us. In Noel, the well was producing in paying quantities at the time suit was filed. The cessation or production in paying quantities was due solely to the "lessee's failure to maintain and repair the wells during the pendency of the suit." Id. In the case before us, the Plaintiffs have averred from the inception of the suit that the Durham Lease was not producing in paying quantities. There is nothing of record which would tend to show that the production from the lease has been affected in any way by the suit. Further, we find that the receipts and expenses allocable to the lease since the suit was filed are relevant to the issue of whether production has been "sufficient to induce a reasonably prudent operator to continue production in an effort to secure a return on his investment or to minimize any loss." La.R.S. 31:124.

2. Inclusion of Operator's Overhead Expenses.
Next, the Defendants assert that the trial court's analysis of the paying quantities question was fatally flawed by its finding that "whether or not the Lease was operated by Montex Drilling Company or W.A. Moncrief, Jr. is not important to this Court." This finding could affect the determination of expenses to be included *1058 in the calculation of profit or loss. See Edmundson Bros. Partnership v. Montex Drilling Co., 95-981 (La.App. 3 Cir. 4/3/96); 672 So.2d 1061, reversed, 96-1652 (La.10/4/96), 679 So.2d 1364. The Defendants argue that "[t]he relationship between the Moncrief family and Montex compels the conclusion that under the rule of Menoah Petroleum, the operator's overhead must be excluded from the calculation of whether the Edmundson No. 1 well produced in paying quantities."
After reviewing the record in this matter, we find that we need not reach the question of whether operating expenses should be considered in connection with this issue. Even using the analysis put forward by the Defendants' expert, the lease did not produce in paying quantities. The Defendants' expert excluded the operator's overhead from his calculations. He opined that the lease produced a profit of $139.00 per month for the eighteen-month period preceding the filing of suit. The trial judge found, and we agree, that this amount is not sufficient to "induce a reasonably prudent operator to continue production." This is a fact determination and may not, therefore, be overturned absent manifest error. Finding no manifest error, we conclude that the trial court correctly found that the lease should be canceled for failure to produce in paying quantities.

IV. SHELL LEASE
There are three issues before this Court involving the Shell Lease:
Were the Plaintiffs estopped by their demand for development from later claiming that the Shell Lease expired due to the passage of ninety days without production? Were the Plaintiffs entitled the punitive damages due to Defendants' fraud or gross negligence? As to the award of damages, were the Defendants entitled to a credit against any damages owed Plaintiffs for operating expenses; was the trial court correct in granting Plaintiffs an award for lost leasing opportunities and was the award for attorneys' fees inadequate or excessive.

A. History

On appeal, the issues involving the Shell Lease revolve around a determination of when production ceased. Attempts to restore significant production, production from the EE# 2 well stopped completely on November 9, 1987. After this date and up to December 24, 1987, the gauge reports show that the tank at the EE# 2 contained 197.05 barrels of oil. However, on December 25, 1987, Robert Guidry, a Moncrief employee, gauged the tank and noted a level of 202.05 barrels, an increase of exactly five barrels of oil. Guidry testified that on January 13, 1988, he "circulated" the tank to remove water and that, thereafter, the level of the tank returned to 197.05 barrels of oil, exactly the level it contained prior to December 25, 1987. Patsy Holcomb, the Moncrief employee responsible for filing production reports with the State of Louisiana, reported the change back to 197.05 barrels as a correction of the mistake in Guidry's reports.
Scott Bouline, an engineer employed by Moncrief, testified that he was a "problem man" for Moncrief. He became aware that the well was a problem sometime in late 1987. He made notes sometime after November 9, 1987, indicating that, because of the November 9, 1987 shut down, something would have to be done about the well by March 9, 1988. He assumed that the lease provided for a 120-day period before expiring for lack of production. He recommended to Moncrief that the well be reworked to the Wilcox formation. Bouline's testimony and the testimonies of other witnesses confirm that Moncrief was not interested in reworking the well and was ready to let the lease expire. Duane McDaniel, a land man on the Moncrief staff, testified that Moncrief agreed to allow him to attempt to farm out the reworking of the well. He farmed it out to Hexagon Petroleum, giving them a deadline of March 9, 1988, to begin operations. *1059 This deadline was later extended to March 20, 1988. McDaniel testified that he arbitrarily selected March 9 to allow a buffer before the lease expired on March 25, 1988 (as it would have if there had been production on December 25, 1987). He testified that he was aware of the December 25 production and of the ninety day cessation of production provision in the lease.
Robert Edmundson submitted evidence showing that in February 1988, in contacting Moncrief regarding the expected production for the year, he was told that the EE# 2 would be plugged unless a farm out agreement was reached. He later received a royalty check and learned that Hexagon had taken over the well. He testified that in late 1991 he learned about leasing activity in the area and began investigating the well. He testified that the records he obtained led him to believe the well had been producing. Therefore, he made a demand for development. He stated that he would not have made a demand for development if he had known that the EE# 2 had not produced for over ninety days.
At trial, considerable evidence and testimony was submitted with regard to whether the EE# 2 well actually produced the five barrels reported on December 25, 1987. The trial judge found that the well did not actually produce on December 25, 1987 and that, as a result, the Shell Lease expired by its own terms ninety days from the November 9, 1987 shut-in date. The Defendants do not contest this finding on appeal. They do, however, raise other issues.

B. Are the Plaintiffs Estopped by Their Demand for Development From Claiming That the Shell Lease Expired Because of a Ninety Day Cessation of Production?

Defendants contend that the Plaintiffs should be estopped from claiming cessation of production because they failed to notify the Defendants when they discovered problems with continuous production in spite of the fact that the Defendants were drilling an expensive well, the EE# 22-1. However, the record supports a finding that the Plaintiffs brought this problem to the attention of Moncrief's attorney by letter in May of 1992.
The Defendants further contend that the Plaintiffs are estopped from making this claim by their December 10, 1991, demand for development. After the inception of this suit, the Plaintiffs amended their original petition to include a claim that the Shell Lease expired by its own terms in that it ceased producing for more than ninety days.

1. Law
In support of their contention, Defendants cite the comments to La.R.S. 31:124:
A suit seeking damages or dissolution for nonperformance of the obligation of further development is inconsistent with one contending that the lease has terminated for failure to produce in paying quantities. The former must usually be preceded by a demand for performance, thus admitting that the lease is still in force, whereas in the latter, performance is not what is desired by the lessor, his position being based on the contention that the lease has terminated automatically. Thus, the lessor claiming expiration has made a meaningful election.

2. Trial Court's Findings
The trial judge gave the following reasons for finding that the demand for development did not act to estop the Plaintiffs from claiming the expiration of the Shell Lease because there had been no production for ninety days:
Defendants contend that plaintiffs demand for development issued on December 10, 1991 to Moncrief is an admission that both the Shell Lease and Durham Lease were in full force and effect, and therefore, plaintiffs (sic) cannot then demand cancellation of the Leases for lack of paying quantities. Defendants contend *1060 that a demand for development and a demand for release on the theory that the Lease is expired are mutually inconsistent and that Louisiana Law declares that they cannot be maintained at the same time.
In this case, the Edmundson's (sic) made demand for development on December 10, 1991. In response to the demand, Moncrief notified plaintiff that Well locations were being staked on both the Durham and the Shell Lease. (P103). This was prior to the time that plaintiff became aware of any potential problems with the Shell Lease. Moncrief's letter was dated January 30, 1992. Plaintiff testified that on February 4, 1992 he met with Tom Durham, (P105) and at that time first began to question the Shelf Lease. On February 12, 1992 Moncrief issued correspondence indicating that Well locations were being staked for the EE# 3 and EE# 4 Wells. In April of 1992, plaintiff retained Paul Seaux to investigate the lease problems (P109). Plaintiff testified that in April of 1992 he still was not aware of all Lease problems. In May of 1992, Robert Wright was retained by plaintiff to perform investigation. This investigation continued in June of 1992 with a land man hired by plaintiff visiting Moncrief and reviewing records. The evidence at trial clearly reflects that plaintiff was unaware of the problems with the Leases as of the date for the demand of development, that being December 10, 1991. He did not have sufficient information to indicate that the wells were no longer producing in paying quantities.
This Court finds that plaintiffs are not estopped from pursuing the development demand and lack of paying quantity issues. This is based on this Courts (sic) finding that plaintiff did not have the information at hand in December of 1991 to raise the paying quantities issue. Specifically, the public records filed by defendant with the Department of Conservation clearly indicated that both the EE# 1 and EE# 2 Wells produced continuously and substantially. These records have proven to be in error, and the error has been admitted by Moncrief. The error occurred when Moncrief improperly designated lease boundaries on filings with the Department of Conservation. The Office of Conservation believed that the EE# 1 and EE# 2 Wells were on the same lease. Other filings with the Department of Conservation by Moncrief also acted as indication that the Wells were producing. Plaintiff had full right and authority to rely on these filings when making his decisions as to action to take concerning his leases. Certainly, plaintiff could have requested information from Moncrief as he did after February, 1992. However, plaintiff only did so after learning information in a meeting with Tom Durham. Up until that time, plaintiff relied fully on Moncrief's filings with the Department of Conservation. As stated before, these filings were full of errors.
This issue is simple. Plaintiff learned of leasing activity in the area of his property. They began to investigate the status of their leases and in so doing, relied on public records indicating that their leases were held by production. Their only remedy at that point was to make demand for further development, which they did. After the demand for development, plaintiff began to learn of other problems with the lease and he pursued same. Defendant complied with the development demand on the Shell Lease, however, the EE# 22-1 did not prove to be as profitable as hoped to be. However, even if it would have been so profitable, plaintiff still could pursue a demand for cancellation of the leases for lack of production in paying quantities or based on cessation of production.
Defendant's Estoppel defense is without merit and is therefore DENIED.
We agree with the trial court's analysis of this situation. The authority cited by *1061 the Defendants in support of their position does not contemplate a situation in which the Lessor does not have access to accurate information with regard to production. Nor does the record support Defendants' contention that the Plaintiffs could have obtained this information had they exercised due diligence. Given the facts before us, it would work an injustice on the Plaintiffs to hold that they are estopped from making a claim for cessation of production because, based on inaccurate information supplied to the State by the Defendants, they made a demand for development.
Accordingly, we find that the Plaintiffs' demand for development did not act to estop them from asserting a claim that the Shell Lease had expired due to a cessation in production in excess of ninety days.

C. Punitive Damages

Plaintiffs contend that they are entitled to punitive damages either due to Defendants' fraudulent concealment of the expiration of the Shell Lease or alternatively, due to Defendants' gross negligence in connection with the reporting of production on the Shell Lease. We agree with the reasoning of the trial court and find that the Plaintiffs are not entitled to punitive damages.

1. Did the Defendants Fraudulently Conceal the Expiration of the Shell Lease Due to Cessation of Production?
The Plaintiffs assert that the trial court erred in failing to find that the Defendants committed fraud in concealing expiration of the Shell Lease because of a ninety-day cessation of production. As a result, they argue that they are entitled to punitive damages under Texas law[2].

a. Law
The existence of fraud is a question of fact. See Recherche, Inc. v. Jewelry Jungle, Inc., 377 So.2d 1329 (La.App. 1st Cir.1979).
A factual determination may not be set aside on appeal in the absence of manifest error or a finding that it is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979). Further, respect should be accorded the trial court's factual conclusions when such findings are based upon decisions concerning the credibility of witnesses, for only the fact finder can be aware of the variations in demeanor and voice tone that bear so heavily on understanding and believing what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Bingham v. Ryan Chevrolet-Subaru, Inc., 29,453, p. 3 (La.App. 2 Cir. 4/2/97); 691 So.2d 817, 819, writ denied, 97-1155 (La.6/20/97); 695 So.2d 1357. "Since the charge of fraud is a serious one, the person who alleges fraud must carry the burden of establishing it." Hill's Mortuary, Inc. v. Hill, 619 So.2d 1080, 1083 (La.App. 1 Cir.), writ denied, 93-1978, 629 So.2d 346 (La.1993).
Fraud exists if it can be shown that material misrepresentations have been made by one party designed to deceive another to obtain some unjust advantage or to cause loss or inconvenience to the other. LSA-C.C. art. 1953; McPhail v. Louisiana Farm Bureau Rice, Inc., 419 So.2d 977, 979 (La.App. 3rd Cir.), writ denied, 421 So.2d 908 (La.1982); Altex Ready-Mixed Concrete Corp. v. Employers Commercial Union Insurance Company, 308 So.2d 889, 892 (La.App. 1st Cir.), writ denied, 312 So.2d 872 (La.1975). In other words, intent to defraud and loss or damage are two essential elements to constitute legal fraud. McPhail v. Louisiana Farm Bureau Rice, Inc., 419 So.2d at 979. Moreover, fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence. LSA-C.C. art. 1957. See McPhail v. Louisiana Farm Bureau Rice, Inc., 419 *1062 So.2d at 978-79; Altex Ready-Mixed Concrete Corp. v. Employers Commercial Union Insurance Company, 308 So.2d at 892.
McDonough Marine Service, a Div. of Marmac Corp. v. Doucet, 95-2087, p. 6 (La.App. 1 Cir. 6/28/96); 694 So.2d 305, 308-9.

b. Trial Court Findings
In connection with the question of whether the Defendants acted fraudulently, the trial court summarized its findings in regard to the evidence as follows:
The evidence presented at trial confirms that W.A. Moncrief, Jr. is a tough, hard, and successful oil man. The evidence further confirmed that he was and is the head of a very large operation. The Edmundson Wells were only a small part of Moncrief's Avoyelles Parish operations, and even a smaller part of Moncrief's overall operation. The Court finds that Moncrief did not conceal the expiration of the Shell Lease.
.... Plaintiff contends that this willful deceit was performed by Moncrief's concealment, nondisclosures, and misrepresentations to the State of Louisiana, others in the oil and gas industry interested in leasing property in the area, and from plaintiffs.
To succeed on their fraud claims, plaintiff must prove a misrepresentation or failure to disclose by Moncrief; Moncrief's intent to deceive; reliance by plaintiff on Moncrief's informations; and resulting loss or damage to plaintiff. Proof submitted at trial falls woefully short of confirming fraud.
Plaintiff contends that a lessee is in sole possession of information needed to determine whether a lease has expired. The evidence in this case does not prove this claim more probable than not. The evidence shows that records are available in the Department of Conservation. The site of the oil well is certainly available for inspection, including the oil storage tanks. Also, plaintiff was in contact with Moncrief. Moncrief's records were available for review upon request.
The evidence produced at trial indicates that Moncrief's large organization had many holes in it. The organization committed many errors in its filing with the Department of Conservation. These errors were not, based on the evidence presented at trial, intentional. They were negligent, however. Plaintiff did not prove more probable than not that all information submitted by Moncrief's office to the State of Louisiana was false and was known by its preparer to be false. What plaintiff did prove is that Moncrief's internal checks and balances system left much to be desired. The miscalculation of the lease expiration date by Scott Bouline was simply a miscalculation. Bouline testified that he initially believed the lease to have a 120 day cessation of production clause. McDaniel testified that he knew the lease to contain a ninety day clause, however, he stated that the ninety days began to run, in his opinion on December 25, 1987. The Court has already found this testimony to be lacking in credibility.
The errors committed by Moncrief's employees did not become evident until plaintiffs investigation and until after the filing of the lawsuit. Plaintiff contends that the records were falsified to indicate the five barrels of production. This Court does not so believe. This Court believes that Robert Guidry and/or Chester Babbs made an error. Guidry tried to correct the error via "circulation", but the paperwork in Moncrief's office had already begun.
Most important to this Court is Moncrief's alleged motive to commit fraud. Plaintiff contends that Moncrief's motive was established by evidence indicating that he controlled 12,000 acres in Avoyelles Parish and had invested millions of dollars in the area. However, plaintiff does not mention that Moncrief's initial reaction to the condition of the *1063 EE# 2 Well (when brought to his attention in the meeting with Scott Bouline and Duane McDaniel), was to plug and abandon the Well. Moncrief was willing to give up the lease at this point and only upon urging from his employees did the farmout agreement with Hexagon become a reality. In fact, in early 1986, it appeared that this Well would be plugged and abandoned.
Further, plaintiffs contend that Moncrief claimed to be owner of the lease by virtue of the December 25, 1987 production. However, this Court believes that Moncrief asserted in 1991, 1992, and 1993 that he was owner of the lease by virtue of Moncrief's production and later by Hexagon's production. This is further substantiated by the fact that as soon as Moncrief receive[d] plaintiffs demand for development, he took active steps in planning to develop the lease. These active steps resulted in the drilling of the EE# 22-1 Well. Had Moncrief been fraudulently concealing the expiration of the lease would they risk drilling the EE# 22-1 knowing all records would be scrutinized? This Court finds it to be a definite stretch to contend that Moncrief was fraudulently concealing the expiration of the Shell Lease and would still drill a 4.8 million dollar oil well. Certainly if he had intentionally deceived plaintiff or was in process of intentionally deceiving plaintiff, he would not risk the drilling of such a Well.
What this Court believes Moncrief did is very simple. As stated earlier, this Court finds that Moncrief believed that the Shell Lease was held by production, Moncrief's and Hexagon. As soon as he learned that plaintiff was questioning the validity of the lease on this issue, after he had already begun to drill the EE# 22-1 Well, Moncrief became extremely angry. At that point he began to use every legal means available and claimed the benefit of every law which may be in his favor, to hold the Shell Lease. This was not fraud. This was tough, hard, and good business judgment. Moncrief's records and Moncrief's employees committed many errors, miscalculations, and made many mistakes. However, the evidence did not prove more probable than not that the mistakes were fraudulent.
After reviewing the evidence, we find no error in the trial court's assessment of the evidence. Therefore, we will not overturn its determination that the Defendants' conduct was not fraudulent.

2. Were the Defendants Grossly Negligent in Connection with the Reporting of Production on the Shell Lease?
Alternatively, the Plaintiffs argue that they are entitled to punitive damages under Texas law because the Defendants were grossly negligent in connection with the reporting of production on the Shell Lease.
a. Law
The Louisiana Supreme Court in Ambrose v. New Orleans Police Dept. Amb. Serv., 93-3099 (La.7/5/94); 639 So.2d 216, 219-220 defined gross negligence as follows:
Louisiana courts have frequently addressed the concept of gross negligence. Gross negligence has been defined as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." State v. Vinzant, 200 La. 301, 7 So.2d 917 (La.1942). Gross negligence has also been termed the "entire absence of care" and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." Hendry Corp. v. Aircraft Rescue Vessels, 113 F.Supp. 198 (E.D.La. 1953) (applying Louisiana law). Additionally, gross negligence has been described as an "extreme departure from ordinary care or the want of *1064 even scant care." W. Page Keeton, et. al., Prosser & Keeton on the Law of Torts, Sec. 34, at 211 (5th ed.1984); 65 C.J.S. Negligence, Sec. 8(4)(a), at 539-40 (1966 & Supp.1993). "There is often no clear distinction between such [willful, wanton, or reckless] conduct and `gross' negligence, and the two have tended to merge and take on the same meaning." Falkowski v. Maurus, 637 So.2d 522 (La.App. 1st Cir.), writ denied, 629 So.2d 1176 (La.1993) (quoting Prosser & Keeton, supra, at 214). Gross negligence, therefore, has a well-defined legal meaning distinctly separate, and different, from ordinary negligence.
Sportsman Store of Lake Charles, Inc. v. Sonitrol Sec. Systems of Calcasieu, Inc., 98-851, p. 13 (La.App. 3 Cir. 12/23/98); 725 So.2d 74, 82.
Given the evidence of record as outlined above, although the Defendants' record keeping appears to have been careless at best, we cannot say that the Defendants' conduct shows an "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." Id. Accordingly, we cannot find that they have been grossly negligent.

V. DAMAGE AWARDS

A. Production/Operating Costs

1. Should the Defendants Have Been Allowed to Deduct Any Operating Costs of the EE# 2 and EE# 22-1 Wells from the Award of Damages?
In connection with the Shell Lease, the trial court awarded the Plaintiffs $183,303.72 for lost production revenue and 50% of future well revenues. With regard to the EE# 2 well, the award of future well revenue was made from January 1998 forward without deduction of costs, the court having found the Defendants to be in bad faith with regard to this well. With regard to the EE# 22-1 well, drilled in 1992, the award of future well revenue was made from date of judicial demand in 1993 until December 1, 1997, allowing deduction of costs and royalties paid and from December 1, 1997 forward, without deduction of costs. The Defendants contend that the trial court erred in refusing to allow them to deduct the costs of production of the EE# 2 well from the award of damages on the Shell Lease. The Plaintiffs argue that because the Defendants were in bad faith they should not be allowed to deduct costs of production for either the EE# 2 or EE# 22-1 well.
La.Civ.Code art. 488, regarding the reimbursement of expenses by possessors in good or bad faith, provides that:
Products derived from a thing as a result of diminution of its substance belong to the owner of that thing. When they are reclaimed by the owner, a possessor in good faith has the right to reimbursement of his expenses. A possessor in bad faith does not have this right.
Because the extraction of minerals diminishes the substance of the thing, a possessor of minerals in bad faith does not have the right to have his expenses reimbursed. See Yiannopoulos, 2 La. Civil Law Treatise 3rdProperty §§ 42 & 275.
The Defendants argue that the trial judge erred in finding them to be in bad faith as regards the Shell Lease because they did not know the defects in their ownership of the lease. While good faith is presumed, the presumption may be rebutted on proof that the possessor knew or should have known that he is not the owner of the thing he possessed. See, La.Civ.Code art. 3481. In this case, the record supports the conclusion that the Defendants should have known that the lease had expired ninety days after production ceased in late 1997. At best, only their own negligence kept this knowledge from them.
Therefore, the record supports a finding that, not only were the Defendants in bad faith with regard to the EE# 2 well; they were in bad faith possession of the entire *1065 Shell Lease. Therefore, we find that the Defendants are not entitled to deduct the expenses of either well on that property and the judgment of the trial court is so amended.

2. Should the Defendants Have Been Allowed to Deduct Any Operating Costs of the EE# 1 Well from the Award of Damages?
The Plaintiffs assert that the trial court erred in allowing the Defendants to deduct operating expenses of the EE# 1 well from the award of future well revenues. Plaintiffs argue that under the provisions of La.Civ.Code art 487, the Defendants were bad faith possessors of the Durham Lease after this suit was filed, and as such are not entitled to recover operating expenses.
La.Civ.Code art. 487 provides that:
For purposes of accession, a possessor is in good faith when he possesses by virtue of an act translative of ownership and does not know of any defects in his ownership. He ceases to be in good faith when these defects are made known to him or an action is instituted against him by the owner for the recovery of the thing.
Therefore, the Defendants, although in good faith with regard to the Durham Lease prior to judicial demand, were in bad faith thereafter. Accordingly, under La.Civ.Code art. 488, they were not entitled to recover costs of production in connection with the Durham Lease after that date. The judgment of the trial court is amended to reflect this.

B. Lost Leasing Opportunities

1. Did Lease Opportunities Exist in 1988?
The Defendants argue that the trial court erred in making an award for lost leasing opportunities for 1988. They contend that the evidence supports the conclusion that no opportunities for mineral leasing existed in that year.
The trial court made a finding of fact that the Plaintiffs lost leasing opportunities for 1988 and gave written reasons for its finding, as follows:
Plaintiffs allege that they could have leased the acreage covered by the Shell Lease in 1988 for $100.00 per acre. Defendants contend that between 1988 and 1991 there was no leasing in the area and therefore plaintiffs could not have suffered any damage for lost leasing opportunities in 1988.
To support their position, plaintiffs produced testimony through Gerald Begnaud indicating that although his family property, located near plaintiffs property, was not leased in 1988 through 1991, his property would have been leased had it had production prior to 1988. They also presented evidence through the testimony of Guy Ellison indicating that because of the history of the EE# 2, the possibilities in the Tuscaloosa trend, and based on the Austin Chalk play in the area, this acreage could have been leased in 1988 for $100.00 per acre plus rentals of $50.00. This testimony is somewhat suspect, however, evidence was presented indicating that various lease extensions were executed in the area during this period of time. Plaintiff was not asked whether or not he would have executed such an extension or have demanded a full blown lease. This Court, however, based on all testimony finds more probable than not that plaintiff would have demanded a full lease in 1988 had he been aware at that time of the expiration of the Shell Lease. The witnesses agreed that the best place to look for oil is where it had already been found. Since it had recently been found on this tract, this Court does not believe that plaintiff's (sic) would have agreed to an extension. This Court believes more probable than not that they would have demanded a new lease. This Court finds more probable than not that plaintiff's property, if available for lease in *1066 1988, would have been an attractive property and would have brought a bonus of $100.00 per acre plus rentals of $25.00 per acre for two years. Plaintiffs lost leasing revenue for 1988 is $132,375.00. (50% of $100.00 × 1765 acres plus $25.00 × 1765 acres plus $25.00 × 1765 acres.)
After reviewing the record, we cannot say that this finding is lacking in evidentiary support. To the contrary, it appears to be based on valid credibility evaluations and reasonably based on the evidence before the court. Finding no manifest error, we will not overturn the trial court's finding in this regard.

C. Attorney's Fees and Costs
The trial court awarded attorney's fees and costs as follows on the Shell Lease:
Judgment is hereby rendered in favor of Elizabeth Edmundson and Edmundson Brothers Partnership and against W.A. Moncrief, Jr., the Succession of W.A. Moncrief, Montex Drilling Company and Glickenhaus Energy Corporation, in solido, for attorney's fees in the amount of 33 1/3% of the damages awarded to plaintiffs for Lost Leasing Revenue, Lost Production Revenue, and Future Well Revenue, including legal interest through the date of this Judgment, together with legal interest thereon from the date of this Judgment until paid; expert fees in the amount of $51,524.62, together with legal interest thereon from the date of judgment until paid; and costs taxable under La.Code Civ. Proc. Art.1920 and La. R.S. 13:4533 in the amount of $32,630.75 together with legal interest thereon from the date of the Judgment until paid.
The court awarded attorney's fees and costs in connection with the Durham Lease as follows:
Judgment is hereby rendered in favor of Elizabeth Edmundson and Edmundson Brothers Partnership and against W.A. Moncrief, Jr., the Succession of W.A. Moncrief and Montex Drilling Company, in soldio (sic) for attorney's fees of 33 1/3%, in the amount of 33.3% of the damages awarded to plaintiffs for Lost Leasing Revenues and Future Well Revenues, including legal interest through date of this Judgment, together with legal interest thereon from the date of this Judgment until paid; expert fees in the amount of $17,174.87, together with legal interest thereon from the date of Judgment until paid; and costs taxable under La.Code Civ. Proc. art. 1920 and La. R.S. 13:4533 in the amount of $10,876.17, together with legal interest thereon from the date of Judgment until paid.

1. Attorney's Fees
The Defendants do not contend that the Plaintiffs are not entitled to attorney's fees. Instead, they contend that attorney's fees awarded are excessive. Conversely, Plaintiffs argue that the fees awarded are inadequate.
The supreme court in State, Dept. of Transp. and Development v. Williamson, 597 So.2d 439, 441-42 (La.1992) (footnote omitted) discussed the factors to be considered by a court in reviewing an award of attorney's fees:
Courts may inquire as to the reasonableness of attorney fees as part of their prevailing, inherent authority to regulate the practice of law. City of Baton Rouge v. Stauffer Chemical Co., 500 So.2d 397 (La.1987); Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La. 1982).... Factors to be taken into consideration in determining the reasonableness of attorney fees include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence *1067 and skill of counsel; and (10) the court's own knowledge. State through Department of Transportation and Development v. Jacob, 491 So.2d 138 (La. App. 3d Cir.1986); State v. Ransome, 392 So.2d 490 (La.App. 1st. Cir.1980). See also State through Department of Transportation and Development v. Estate of Giles Davis [572 So.2d 39 (1990)], supra.

The trial court conducted a thorough review. Its decision was well considered and fully within its wide discretion. We have examined the award in light of the factors enumerated in Williamson. In light of the factors enunciated therein, the award of attorney's fees appears to be neither inadequate nor excessive. We find that the award of attorneys' fees is both reasonable and appropriate.

2. Costs
The Defendants further argue that excessive costs were awarded. The Plaintiffs' argue that the award of costs was inadequate. The trial court discounted the Plaintiffs claim for costs by 50% because of his conclusion that this was the amount allocable to the failed claim for fraud. The Defendants argue that, before reducing the costs by 50%, the court should have eliminated certain costs from the whole, such as the cost of depositions not used at trial, travel costs and the cost of a mock trial.
"A review of the jurisprudence reveals that the trial judge is accorded great discretion in awarding costs (including expert witness fees, deposition costs, exhibit costs and related expenses). Boutte v. Nissan Motor Corporation, 94-1470, p. 8 (La.App. 3rd Cir.9/13/95); 663 So.2d 154, 162." Dupre' v. Maison Blanche, Inc., 97-0652, p. 8 (La.App. 1 Cir. 4/8/98); 712 So.2d 567, 572, writ denied, 98-1239 (La.6/19/98); 721 So.2d 471.
After reviewing the record herein, the cost accounting submitted by the Plaintiffs and the trial court's reasons, we find that the trial court's reduction of the cost award takes into account the concerns voiced by the Defendants. Further, we find that the award is well within the great discretion accorded to the trial court.

VI. CONCLUSION
For these reasons, the judgment of the trial court is amended to delete any deduction of operating costs for the EE# 2 or 22-1 wells and/or the Shell Lease. It is further amended to disallow deduction of operating costs of the Durham Lease after the date of judicial demand. In all other respects the award of damages is affirmed. Costs of this appeal are assessed to the Defendants.
AFFIRMED AS AMENDED.
NOTES
[1] La.R.S. 31:135. Rules of default applicable except as specified

The provisions of the Louisiana Civil Code concerning putting in default are applicable to mineral leases subject to the following modifications.
La.R.S.31:136. Written notice; requirement and effect on claims for damages or dissolution of lease
If a mineral lessor seeks relief from his lessee arising from drainage of the property leased or from any other claim that the lessee has failed to develop and operate the property leased as a prudent operator, he must give his lessee written notice of the asserted breach to perform and allow a reasonable time for performance by the lessee as a prerequisite to a judicial demand for damages or dissolution of the lease. If a lessee is found to have had actual or constructive knowledge of drainage and is held responsible for consequent damages, the damages may be computed from the time a reasonably prudent operator would have protected the leased premises from drainage. In other cases where notice is required by this Article damages may be computed only from the time the written notice was received by the lessee.
[2] Montex and the Moncriefs are allegedly domiciled in Texas.